**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DELPHINE A. ARREY, AKA Arrey Delphine Ayamba, *Petitioner*, v. WILLIAM P. BARR, Attorney General, *Respondent*. | No. 16-73373 Agency No. A208-595-387 OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted December 18, 2018
San Francisco, California

Filed February 26, 2019

Before: Ronald M. Gould and Marsha S. Berzon, Circuit
Judges, and Frederic Block,[*] District Judge.

Opinion by Judge Gould

---

[*] The Honorable Frederic Block, United States District Judge for the
Eastern District of New York, sitting by designation.

## SUMMARY[**]

### Immigration

The panel granted in part a petition for review of the Board of Immigration Appeals' decision affirming an immigration judge's denial of asylum, withholding of removal, and protection under the Convention Against Torture to a citizen of Cameroon, and remanded.

The panel rejected petitioner's contention that she was deprived of her due process right to a full and fair hearing based on the denial of her right to retained counsel and an unbiased fact finder. The panel held that the IJ in this case provided petitioner reasonable time to locate an attorney, where the IJ provided several continuances so she could do so, warned her repeatedly that he would not grant further continuances, and attempted to call her attorney when he failed to appear on the day of her merits hearing. The panel also held that although the IJ was rude and harsh with petitioner, petitioner failed to establish that the IJ's conduct prejudiced her, where the IJ held a complete hearing and made a thorough decision that fully examined the underlying factual matters, and any potential prejudice caused by the IJ's questionable adverse credibility determination was cured by the Board's subsequent decision assuming the credibility of petitioner's testimony in full.

The panel held that the Board committed three legal errors in its application of the firm resettlement bar, which

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

precludes asylum relief if an applicant was firmly resettled in another country prior to arriving in the United States. First, the panel held that the Board erred by failing to consider whether the conditions of petitioner's offer of resettlement in South Africa were too restricted for her to be firmly resettled. Second, the panel held that the Board erred by applying the firm resettlement rule not as a mandatory bar to petitioner's asylum claim, but instead as a limitation on the evidence the Board considered in support of her claim for relief from removal to Cameroon, thus causing the Board to improperly ignore evidence of the abuse petitioner suffered in Cameroon before fleeing to South Africa, as well as evidence of the nature of her relationship with her abuser. Third, the panel held that the Board erred by applying the firm resettlement bar to petitioner's withholding of removal claim, which is not subject to the firm resettlement bar.

Turning to petitioner's CAT claim, the panel held that substantial evidence did not support the Board's determination that petitioner could avoid future harm through internal relocation in Cameroon.

The panel remanded petitioner's asylum, withholding, and CAT claims for further proceedings consistent with its opinion.

**COUNSEL**

Ronald D. Richey (argued), Law Offices of Ronald Richey, Rockville, Maryland, for Petitioner.

Victoria M. Braga (argued), Trial Attorney; Cindy S. Ferrier, Assistant Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent

**OPINION**

GOULD, Circuit Judge:

Petitioner Delphine Arrey petitions for review of the Board of Immigration Appeals' ("BIA" or "Board") decision dismissing her appeal of an immigration judge's ("IJ") denial of her application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). We conclude that the IJ did not deny Arrey her due process rights to counsel and an unbiased factfinder. As to Arrey's asylum and withholding of removal claims, we conclude that the Board erred as a matter of law in its analysis and application of the "firm resettlement" rule. As to Arrey's claim for relief under CAT, we conclude that substantial evidence does not support the Board's determination that Arrey could safely relocate in another area of Cameroon. We grant the petition in part and remand for reconsideration of Arrey's claims consistent with our opinion.

# I

## A

Arrey is a native and citizen of Cameroon. In October 2015, she used her Cameroonian passport to obtain a Mexican visa in Nigeria. After traveling to Mexico, she applied for admission to the United States at a port of entry in California. Because her passport had been taken from her in Mexico, she did not possess or present a valid passport or entry document. The Department of Homeland Security ("DHS") personally served her with a Notice to Appear, charging that Arrey was removable from the United States as an immigrant who, at the time of application for admission, did not possess a valid entry document or passport. The Notice ordered Arrey to appear before an IJ to show why she should not be removed from the United States.

Arrey first appeared before an IJ on December 3, 2015. Arrey said that English was her best language. The IJ explained the process and informed Arrey of her right to hire an attorney, her appellate rights, and the consequences of removal. Arrey said that she was not ready to proceed, so the IJ continued her case for another four weeks. The IJ also told Arrey that if she appeared at the next hearing without an attorney, or with a recently-hired attorney who was not ready to proceed, the IJ would nonetheless proceed with her case.

Arrey's second hearing was held on December 30, 2015. Arrey told the IJ that she had not found an attorney, though she had "tried to get [her] family friends out there to get me one." The IJ questioned whether Arrey had taken "any concrete action" to get an attorney. He told her that "the questions aren't that hard really" and asked her whether she would "have the attorney here in a week." Arrey responded

"a week is too early." The IJ then found that Arrey had not established good cause for a continuance and proceeded to take the pleadings. Based on Arrey's admissions, the IJ sustained the charge of removability. On DHS's recommendation, the IJ designated Cameroon as the country of removal. After Arrey expressed a fear of harm or persecution in Cameroon, the IJ told her to fill out Form I-589 and suggested that she could also look for an attorney before her next hearing.

After filing her asylum application, Arrey appeared for her third hearing on January 27, 2016. There, the IJ scheduled a March 28 hearing to address the merits of her applications for relief and protection. The IJ told Arrey, "if you show up [at the next hearing] and tell me you're not ready . . . I'm going to finish your case on that day with an order of removal." Arrey stated that she understood.

At the March 28 hearing, the DHS attorney told the IJ that Attorney Ronald Richey had recently filed a motion for continuance on Arrey's behalf. The IJ asked Arrey if she was seeking a continuance in her case, and she said that she was. The IJ asked her "why [she] did exactly specifically what I told you exactly not to do?" noting that she had had two months since her January hearing to prepare. He reminded her that "the only way you can have a hearing is to steal a hearing from someone else, and that there are people there who are threatening suicide because they can't get hearing dates."

The IJ's expressed hostility continued: When Arrey asked for "another short time" because her attorney was not available, the IJ told her that he considered her actions "inconsiderate and extremely selfish." He noted that, according to the motion for continuance, Arrey had only contacted her retained attorney "basically less than a week"

before the present hearing. The IJ found "no good cause for a continuance" and made a "finding of dilatory tactics based on the advisal that [he] gave [Arrey] previously."

Notwithstanding the IJ's finding of dilatory tactics, the IJ continued Arrey's case for another week, to April 6. He advised her that "no continuance is going to be granted on April 6, 2016, [and if she was] not ready on that date, [he would] finish [her] case with an order of removal," whether or not her attorney was present.

One day before the rescheduled merits hearing, the Immigration Court received from Richey a motion to appear telephonically, or in the alternative to withdraw as counsel, and a list of intended evidence. A note on these filings indicates that the IJ did not receive the filings before the April 6 hearing, but the record does not indicate why.

Arrey's final hearing occurred on April 6. The IJ asked whether Arrey was ready to go forward, and she said "my attorney said he will come, he could call you through the hearings today." The IJ told her—incorrectly—that Richey "didn't put in any motion for a telephonic hearing." The IJ asked if Arrey wanted to proceed. Arrey responded, "Your Honor, no." The IJ further asked, "are you going to be presenting any evidence today ma'am?," and she said, "Your Honor, I don't know. [Richey] might be on the line because he told me he will have to talk to, he has to be on the line to know−." The IJ told her "[w]e can go forward today by yourself or I can just finish your case with an order of removal, and then, you know, you can talk to your attorney about it later." At that, Arrey told the IJ: "Your Honor, I think you are the good one to take the decision."

The IJ then reminded Arrey about the warnings he had previously given her, and again asked "do you want to

present a case today?" Arrey responded, "Your Honor, I'm not ready." The IJ "[found] [Arrey's] application [for asylum] has been abandoned," but he continued to ask Arrey whether she wanted to proceed.

The IJ explained that there was no way that Richey could appear by telephone for the merits hearing, but the IJ nevertheless agreed to call Richey. The person who answered the phone indicated that "Mr. Richey is not in right now. He should be in any second though." The IJ ended the call and asked Arrey what she wanted to do. He told her that her choices were to "go forward . . . by [herself]" or accept an order of removal. The transcript indicates that Arrey responded "I can [indiscernible]." The IJ then proceeded to ask for documentary evidence from both Arrey and the DHS attorney, to place Arrey under oath, to ask her questions about her claims for relief and protection, and to allow the DHS attorney to cross-examine her. What follows is a summary of Arrey's testimony, which the Board credited as true.

## B

Arrey testified that she was born in 1976 in Cameroon and lived with her family in the village of Nchang until she was twelve years old. Female genital mutilation was practiced in Nchang, but the practice was prohibited in Arrey's Roman Catholic religion. To protect Arrey, her family arranged for her to stay with friends, Jean Thomas and his wife, in the city of Victoria, Cameroon.

Arrey lived in Thomas's home for twenty-six years. During that time, Thomas sexually and physically abused her. He refused to send her to school, beat her, forced her to have sex with him, impregnated her, threatened to kill her,

and told her that her "family would never see her corpse" if she told anyone that he had impregnated her.

On one occasion, Arrey was hospitalized as a result of Thomas's abuse. She then told hospital staff that she was "beaten at home," but she did not identify Thomas as her abuser, and his identity was not reported to police. After Arrey was released from the hospital, she went to a friend's home. Thomas found her there because he knew most of her friends and where they lived. Thomas brought her home and proceeded to viciously beat her with a whip and cables. He told her that she had no right to leave his home and stay elsewhere.

When Arrey was twenty-six, she became pregnant with Thomas's child. Thomas did not want his wife to discover that he was the father, so he threatened to kill Arrey unless she accused one of her friends of impregnating her. Thomas also threatened the friend, who accepted responsibility. Arrey believed that Thomas had abused and threatened her because, against Arrey's wishes and her Catholic faith, he wanted to "marry her like a second wife."

Thomas sometimes brought Arrey to the local police station and accused her of stealing and "do[ing] bad things" in his house. According to Arrey, Thomas was able to convince the police to detain her because he was an influential businessman in the community. Arrey's fear of the police and Thomas prevented her from reporting Thomas's abuse.

Arrey stayed with Thomas despite the abuse, because she believed he protected her from other "assaults in the community" and because her parents could not support her. Although she occasionally stayed with friends, her friends

did not have enough room in their homes to allow her to live with them.

Arrey did not tell her friends about Thomas's sexual abuse, but she told them that he physically abused her. Eventually, Arrey's friends helped her flee from Cameroon and relocate to South Africa. She arrived in South Africa in 2007, was granted refugee status, and remained there for seven years. While Arrey lived in South Africa, Thomas searched for her. He attempted to kidnap their two children from the home of Arrey's friend, where they had been living since Arrey left Cameroon.

Arrey left South Africa in 2014 and returned to Cameroon following two incidents. First, in 2011, she was robbed and assaulted while walking home from work. Her assailants stabbed her in the leg and left her bleeding in the street. She spent three months recovering from her injury.

Second, in 2014, her brother was shot and killed in South Africa. Arrey explained that in her village in Cameroon, when a person dies, it is customary to bury him "in his land." Although she feared returning to Cameroon, she returned with her brother's body, using community donations to pay for the trip. Arrey believed that she was the only person who could return her brother's body because her parents died in 2008.

To avoid being abused by Thomas upon her return, Arrey hid with her church community in Douala. But Thomas knew that she had returned; her friends and family members told him so after he threatened them. After some time, Thomas found Arrey and attempted to rape her on the street outside the church where she was hiding. Arrey was able to escape. She did not report the incident to the police.

Following her encounter with Thomas, Arrey fled Cameroon and traveled through Nigeria and Mexico to get to the United States.

Arrey is not in contact with anyone in Cameroon, and she does not know whether Thomas is presently searching for her. Arrey is afraid to return to Cameroon because she fears Thomas and the Cameroonian police. Arrey is also afraid that she would be forced to undergo female genital mutilation in Cameroon; she knows that the practice still exists in her village and community, although it is typically practiced on girls soon after they reach the age of maturity and not on older women.

In addition to her fears of returning to Cameroon, Arrey testified that she fears returning to South Africa, because of the "bad things she saw in South Africa," including "a lot of blood."

## C

In an oral decision, the IJ denied Arrey's claims and ordered her removed to Cameroon. He found that Arrey had not provided credible testimony, doubting that her passport was stolen and that she experienced decades of abuse without reporting it or leaving.

The IJ also found that Arrey was permanently resettled in South Africa between 2007 and 2014. Based on that finding, the IJ reasoned that he should only consider the abuse Arrey suffered following her return to Cameroon in 2014.

The IJ then concluded that Arrey had not suffered past persecution on the ground that she was not in a relationship with Thomas upon her return to Cameroon; instead, it was

as if Arrey experienced "random crimes against women," which the IJ held did not qualify as persecution on account of a protected ground. Likewise, the IJ determined that Arrey's fear of Thomas amounted to a general fear of violence against women. The IJ rejected Arrey's fear that she would be subjected to female genital mutilation in Cameroon, because the Country report established that there were no credible reports of Cameroonian women over the age of eighteen being subjected to female genital mutilation.

On the basis that Arrey had not established that she suffered persecution based on a protected ground, the IJ concluded that Arrey necessarily had not met her burden of establishing that she merited withholding of removal.

On Arrey's claim for protection under CAT, the IJ determined that Arrey's fear was of Thomas, and not of the Cameroonian government or any public official. The IJ noted that Arrey had never reported the abuse she claimed to suffer to the Cameroonian police. The IJ also rejected Arrey's claim that Thomas would be able to find her anywhere in Cameroon, despite Arrey's contention that Thomas was well-connected. The IJ explained that Thomas's connections would not make Arrey easily identifiable in Cameroon or make her location easily known to Thomas, especially if she relocated to another part of Cameroon.

Arrey, represented by Richey, filed an administrative appeal of the IJ's decision.

## D

The Board issued a written decision on Arrey's appeal. Significantly, in our view, the Board rejected the IJ's adverse

credibility determinations as clearly erroneous and assumed Arrey was credible.

The Board agreed that Arrey had resettled in South Africa before she "voluntarily" returned to Cameroon in 2014. Like the IJ, the Board reasoned that because Arrey was firmly resettled in South Africa, "her claim for asylum from Cameroon relates only to the events after she returned." The Board rejected Arrey's argument that she was persecuted in South Africa on the basis that it was irrelevant, because she was not going to be removed to South Africa.

The Board then held that Arrey had not demonstrated that the harm she suffered in Cameroon upon her return in 2014—threats and one attempted assault of rape—rose to the level of past persecution. In addition, the Board concluded that Arrey had not shown a nexus between the harm she experienced or feared and a protected ground, because Arrey did not claim to be in a domestic relationship with Thomas after she returned in 2014. Finally, the Board agreed that Arrey did not have an objectively reasonable fear of being forced to undergo female genital mutilation in Cameroon due to her age.[1]

---

[1] Notably, the 2015 Report on which both the IJ and the Board based their decisions states that *"[u]nlike in previous years*, there were no credible reports of women ages 18 and above being subjected to" female genital mutilation. But Arrey does not argue that the earlier reports, which report adult women being subjected to female genital mutilation, support her reasonable fear. *See* U.S. Dep't of State, Cameroon 2013 Human Rights Report 24, https://www.justice.gov/sites/default/files/eoir/legacy/2014/04/09/Cameroon.pdf (last visited Dec. 4, 2018). On appeal, she does not contest the finding that she did not have an objectively reasonable fear of female genital mutilation.

Based on those conclusions, the Board affirmed the IJ's denial of asylum. The Board also determined that because Arrey had not met her burden of proof with regard to asylum, she necessarily did not qualify for withholding of removal.

The Board affirmed the IJ's denial of CAT protection. It reasoned that Arrey had not shown that it was more likely than not that Thomas would find her and torture her were she to relocate. The Board agreed with the IJ that Arrey's contention that Thomas was a well-connected businessman did not mean that she could not safely relocate within Cameroon to avoid him.

Lastly, the Board concluded that Arrey had not demonstrated good cause for another continuance and affirmed the IJ's denial of relief and protection in Arrey's case and dismissed her appeal. Arrey timely appealed.

## II

We examine the BIA's "legal conclusions de novo and its factual findings for substantial evidence." *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1059 (9th Cir. 2017) (en banc) (citations omitted). We "cannot affirm the BIA on a ground upon which it did not rely." *Navas v. I.N.S.*, 217 F.3d 646, 658 n.16 (9th Cir. 2000).

## III

### A

We first address Arrey's due process challenges. Petitioners in immigration proceedings have a constitutionally-protected right to a full and fair hearing. *See Vilchez v. Holder*, 682 F.3d 1195, 1199 (9th Cir. 2012); *Barraza Rivera v. I.N.S.*, 913 F.2d 1443, 1447 (9th Cir.

1990).  Arrey contends that her right to a full and fair hearing was violated because she was denied her rights to (1) retained counsel and (2) an unbiased fact finder.  We reject those contentions.

**1**

Both Congress and our court have recognized the right to retained counsel as being among the rights that due process guarantees to petitioners in immigration proceedings.  8 U.S.C. § 1362 (codifying the right to counsel in immigration proceedings); *Gomez-Velazco v. Sessions*, 879 F.3d 989, 993 (9th Cir. 2018) ("The right to be represented by counsel at one's own expense is protected as an incident of the right to a fair hearing under the Due Process Clause of the Fifth Amendment.").

Arrey did not explicitly waive her right to counsel at the April 6 hearing.  "In order for a waiver to be valid, an IJ must generally: (1) inquire specifically as to whether petitioner wishes to continue without a lawyer; and (2) receive a knowing and voluntary affirmative response." *Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004) (citations omitted).

Here, those elements were not met, so there was no knowing and intelligent waiver of the right to counsel. Although the IJ repeatedly asked Arrey whether she would like to continue without her lawyer, she never gave her knowing and voluntary assent.  Even when asked to choose

between continuing with the hearing and an automatic order of removal, she did not consent.[2]

When a petitioner does not waive the right to counsel, "IJs must provide [the petitioner] with reasonable time to locate counsel and permit counsel to prepare for the hearing." *Biwot vs. Gonzalez*, 403 F.3d 1094, 1098–99 (9th Cir. 2005) (citing *Rios–Berrios v. I.N.S.*, 776 F.2d 859, 862–63 (9th Cir. 1985)). The IJ's decision not to continue a hearing is reviewed for abuse of discretion, but we have warned that we will not "allow a 'myopic insistence upon expeditiousness' to render the right to counsel 'an empty formality.'" *Biwot*, 403 F.3d at 1099 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

"No bright line guides our consideration of what constitutes reasonable time." *Biwot*, 403 F.3d at 1099. The inquiry is fact-specific:

> We pay particular attention to the realistic time necessary to obtain counsel; the time

---

[2] To the contrary, Arrey explicitly answered "no" at least twice when the IJ inquired whether she would like to proceed without counsel. At the outset, the IJ asked, "Ma'am, are you ready to proceed today?" and Arrey told him, "my attorney said he will come." Next, the IJ asked, "Did you want to go forward by yourself today, ma'am?" and Arrey responded, "Your Honor, no." After further discussion, the IJ asked, "are you going to be presenting evidence today, ma'am?" and she responded, "Your Honor, I don't know," and suggested that her attorney might have called in. The IJ then asked Arrey to choose between going forward by herself or being ordered removed. She responded, "Your Honor, I think you are the good one to take the decision." Later, he asked, "do you want to present a case today," and she said "Your Honor, I'm not ready." Finally, he said, "So, what do you want to do? Your choices are go forward today by yourself or finish your case with an order of removal today." She said, "I can [indiscernible]."

> frame of the requests for counsel; the number of continuances; any barriers that frustrated a petitioner's efforts to obtain counsel, such as being incarcerated or an inability to speak English; and whether the petitioner appears to be delaying in bad faith.

*Id.* A petitioner is not denied the right to counsel where "continuing the hearing would have been futile" or where "the IJ had done everything he reasonably could to permit [the petitioner] to obtain counsel." *Id.* at 1099–1100 (citing *Vides-Vides v. I.N.S.*, 783 F.2d 1463, 1469–70 (9th Cir. 1986)); *see also Hernandez-Gil v. Gonzalez*, 476 F.3d 803, 805–08 (9th Cir. 2007) ("When [a petitioner] has engaged counsel and the IJ is aware of the representation, if counsel fails to appear, the IJ must take reasonable steps to ensure that the [petitioner's] statutory right to counsel is honored.").

We hold that the IJ in this case provided Arrey with reasonable time to locate counsel. Although Arrey was detained during the proceedings, the IJ granted several continuances so that she could acquire an attorney.[3] And when her lawyer Richey did not appear at her final hearing, the IJ called Richey's office. The IJ also repeatedly warned Arrey that the IJ would not continue her case any further; Arrey, who had indicated that English was her best language, was on notice of the consequences.

---

[3] The IJ granted four continuances to allow Arrey to obtain counsel. The continuance from January 27 to March 28, however, appears to have been the result of the IJ's scheduling availability.

**2**

Arrey also contends that she was denied her right to an unbiased fact finder. *See Reyes-Melendez v. I.N.S.*, 342 F.3d 1001, 1006 (9th Cir. 2003) ("The Due Process Clause requires that [petitioners] threatened with deportation are provided with the right to a full and fair hearing. A neutral judge is one of the most basic due process protections." (internal quotation marks and citations omitted)). Although an IJ may "aggressively and sometimes harshly" question a witness, *Melkonian v. Ashcroft*, 320 F.3d 1061, 1072 (9th Cir. 2003), he or she may not become a "partisan adjudicator seeking to intimidate" the petitioner rather than "a neutral fact-finder interested in hearing the petitioner's evidence," *Colmenar v. I.N.S.*, 210 F.3d 967, 971 (9th Cir. 2000). A petitioner must show that the denial of his or her right to a neutral fact-finder "potentially affected the outcome of the proceedings." *Colmenar*, 210 F.3d at 972 (internal quotation marks and alteration omitted).

The IJ in this case was rude and harsh with Arrey. He badgered Arrey, accused her of selfishness and bad faith, and threatened to enter an order of removal. But, Arrey has not shown that the harshness or rudeness prejudiced her: Despite his harshly expressed and excessive frustration, the IJ held a complete hearing and made a thorough decision that fully examined the underlying factual matters. And, crucially, although the IJ made a questionable adverse credibility finding against Arrey, any prejudice from that was cured by the Board's subsequent decision assuming the credibility of her testimony in full.

**B**

We now address Arrey's contention that the Board misapplied the "firm resettlement rule." That rule holds that

an applicant may not be granted asylum if he or she "was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(vi); *see also Su Hwa She v. Holder*, 629 F.3d 958, 962 (9th Cir. 2010), *superseded by statute on other grounds as stated in Ming Dai v. Sessions*, 884 F.3d 858, 867 n.8 (9th Cir. 2018). Determining whether the firm resettlement rule applies involves a two-step process: First, the government presents "evidence of an offer of some type of permanent resettlement," and then, second, "the burden shifts to the applicant to show that the nature of his [or her] stay and ties was too tenuous, or the conditions of his [or her] residence too restricted, for him [or her] to be firmly resettled." *Maharaj v. Gonzales*, 450 F.3d 961, 976–77 (9th Cir. 2006) (en banc).

Here, the Board committed three errors in its application of the firm resettlement rule. First, the Board improperly concluded that Arrey had firmly resettled in South Africa. It completed step one of the analysis, noting that Ms. Arrey received an offer of refugee status. But it did not proceed to step two to consider Arrey's evidence that "the conditions of [her] residence [were] too restricted[] for [her] to be firmly resettled." *Maharaj*, 450 F.3d at 976–77. In fact, the Board explicitly declined to consider Arrey's "claim[] that she experienced past persecution in South Africa, and that she will not be safe there."**[4]** That evidence could rebut the

---

**[4]** The Board's error in this respect is exacerbated by an oddity in this case: Arrey has been ordered removed not to South Africa—where she allegedly had firmly resettled—but to Cameroon. *See Mengstu v. Holder*, 560 F.3d 1055, 1060 (9th Cir. 2009) (rejecting finding that Ethiopian firmly resettled in Sudan in part because "[t]he IJ himself designated Ethiopia, rather than the Sudan, as the country of removal."). In most of our published decisions affirming application of the firm resettlement rule, the applicant has been ordered to return to the country

finding of firm resettlement in light of our previous holding that "firmly resettled aliens are by definition no longer subject to persecution," *Yang v. I.N.S.*, 79 F.3d 932, 939 (9th Cir. 1996). "Because of the evidence that [Arrey] may not have found a haven from persecution in [South Africa, Arrey] also has established at least a plausible claim that [s]he is not firmly resettled in [South Africa]." *Siong v. I.N.S.*, 376 F.3d 1030, 1040 (9th Cir. 2004) (internal quotation marks and citations omitted). The Board's decision to ignore that evidence made its firm resettlement determination incomplete, and erroneous as a matter of law.

Second, the Board incorrectly applied the firm resettlement rule not as a mandatory bar to Arrey's claim for asylum—as the regulations intend it to operate, 8 U.S.C. § 1158(b)(2)(A)(vi)—but instead as a limitation on the evidence the Board considered in support of her claim. This error infected both the Board's past persecution and protected ground analyses. It ignored the abuse Arrey experienced at the hands of Thomas and the police before

where he or she was permanently resettled. *See, e.g.*, *Sung Kil Jang v. Lynch*, 812 F.3d 1187, 1189, 1193 (9th Cir. 2015) (upholding firm resettlement rule applied to petitioner from North Korea, who was firmly resettled in South Korea, and ordered removed to South Korea); *Nahrvani v. Gonzales*, 399 F.3d 1148, 1152 (9th Cir. 2005) (upholding firm resettlement rule applied to petitioner from Iran, who was firmly resettled in Germany and ordered removed to Germany); *Vang v. I.N.S.*, 146 F.3d 1114, 1116–17 (9th Cir. 1998) (upholding firm resettlement rule applied to petitioner from Laos who was firmly resettled in France and ordered removed to Thailand, France, or Laos, in that order of preference); *Yang*, 79 F.3d at 934, 936–37 (upholding firm resettlement rule applied to petitioners from Laos, who were firmly resettled in France, and ordered removed to France). *But see Maharaj v. Gonzales*, 450 F.3d 961, 966, 978 (9th Cir. 2006) (en banc) (remanding analysis of firm resettlement rule applied to petitioner from Fiji, who resettled in Canada, and was ordered removed to Fiji).

she left for South Africa. And it ignored Arrey and Thomas's relationship, which informed his reasons for targeting her, her need to seek shelter with her friends to avoid him, and the nature of his abuse. The firm resettlement rule does not tell the Board to ignore evidence of the petitioner's persecution in a country to which she is to be removed because she was for a while resettled, firmly or otherwise, elsewhere. We conclude that doing so was improper in this case.**[5]**

Third, the Board erred by applying the firm resettlement rule to limit the evidence it considered in support of Arrey's withholding of removal claims. The firm resettlement rule does not apply to those claims. *Siong*, 376 F.3d at 1040–41. So the firm resettlement rule could not bar otherwise relevant evidence on Arrey's withholding of removal claims.

We remand for proceedings consistent with this opinion. *See Gonzales v. Thomas*, 547 U.S. 183, 185–86 (2006) (per curiam) (holding that when the Board has not reached an issue, this Court should remand to allow the Board to consider the issue in the first instance).

---

**[5]** It is true we have held that a petitioner's "history of willingly returning to his or her home country militates against a finding of past persecution or a well-founded fear of future persecution." *Ming Dai v. Sessions*, 884 F.3d 858, 871 (9th Cir. 2018) (quoting *Loho v. Mukasey*, 531 F.3d 1016, 1017–18 (9th Cir. 2008)). But in this case, the Board did not rely on that reasoning to rebut the presumption of a well-founded fear of persecution, presumably because Arrey had good reasons to return to Cameroon. *See Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1091–92 (9th Cir. 2008) (holding that where purpose of return trips was to gather income to flee permanently, trips did not rebut presumption of well-founded fear).

## C

Finally, we consider whether the Board erred in determining that Arrey was able to safely relocate in Cameroon to avoid future harm.

CAT prohibits the government from returning a person to a country where it is "more likely than not" that he or she will be tortured.  8 C.F.R. § 1208.16(c)(2).  The torture must be by government officials or private actors with government acquiescence.  *Cole v. Holder*, 659 F.3d 762, 771 (9th Cir. 2011).  Unlike applications for asylum and withholding of removal, "[a]n application for CAT relief need not show that he will be tortured 'on account of' any particular ground."  *Id.* at 770 (citing *Kamalthas v. I.N.S.*, 251 F.3d 1279, 1283 (9th Cir. 2001)).  "In deciding whether the applicant has satisfied his or her burden, the IJ must consider all relevant evidence, including but not limited to the possibility of relocation within the country of removal."  *Maldonado v. Lynch*, 786 F.3d 1155, 1164 (9th Cir. 2015) (en banc); *see also* 8 C.F.R. § 1208.16(c)(3).

Here, substantial evidence did not support the Board's conclusion that Arrey could safely relocate within Cameroon to avoid future harm.  The Board "agree[d] with the Immigration Judge that the respondent's argument that [Thomas] is a 'businessman' and has lots of friends does not mean that she could not safely and reasonably relocate to avoid harm."  The Government now argues that this determination is supported by substantial evidence because "save for a singular encounter from which she escaped, Arrey was able to avoid Thomas by living in a different city when she returned," "the record does not indicate that Arrey would be unable to live in a different city than Mr. Thomas," and "the record does not indicate that Mr. Thomas has the

resources and ability to locate her anywhere within the country."

But that is not what the record indicates. Arrey—whom the Board found credible—testified that she could not escape Thomas due to his connections. The Board did not rebut that testimony with country conditions evidence or any other evidence. Such bare speculation, without other support in the record, cannot properly form the basis of an adverse credibility finding, even in post-REAL ID Act cases. *See Singh v. Lynch*, 802 F.3d 972, 977 (9th Cir. 2015) (explaining that "an adverse credibility determination cannot be based on complete speculation and conjecture," but holding that adverse credibility determination based on inherent implausibility of petitioner's account was permissible because it was based on record evidence rather than pure speculation).

Here, the record reflects that even when Arrey was in hiding from Thomas in a different city, Thomas was able to track her down. When he did, he attempted to rape her. In light of that evidence, we must conclude that substantial evidence did not support the Board's determination that Arrey was not likely to be tortured because she could safely relocate within Cameroon.

We remand this claim for proceedings consistent with our holding.

## IV

The Petition for Review is **GRANTED** in part; the case is **REMANDED** for further proceedings.