**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| YVETTE NGMENANG AKOSUNG, *Petitioner,* v. WILLIAM P. BARR, Attorney General, *Respondent.* | No. 17-72829 Agency No. A209-129-271 OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted February 3, 2020
Phoenix, Arizona

Filed August 14, 2020

Before: Susan P. Graber, Andrew D. Hurwitz,
and Eric D. Miller, Circuit Judges.

Opinion by Judge Miller

# SUMMARY*

## Immigration

Granting Yvette Akosung's petition for review of the Board of Immigration Appeals' decision affirming the denial of asylum and related relief, and remanding, the panel held that substantial evidence did not support the Board's determinations that: 1) Akosung could relocate within Cameroon to avoid future persecution or torture; 2) Akosung's proposed social group of "women resistant to forced marriage proposals" lacked social distinction; and 3) Akosung failed to establish a clear probability of torture with government acquiescence.

The panel concluded that Akosung's ability to elude her pursuers at great effort and risk, while in hiding, did not establish that she would be able to avoid persecution or torture by relocating within Cameroon.

The panel also concluded that the record did not support the Board's determination that Akosung's proposed social group lacked social distinction. The panel explained that to the extent the Board's decision rested on a requirement of ocular visibility, it was inconsistent with Board precedent. The panel further concluded that to the extent the Board found that Akosung's proposed group was not regarded as distinct in Cameroonian society, that finding was inconsistent with Akosung's testimony. The panel rejected the government's contention that Akosung waived any

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

challenge to the Board's social distinction determination by redefining her proposed social group in her briefs to this court, concluding that her challenge was sufficiently presented to permit review.

The panel concluded that the Board's denial of CAT protection was flawed because the Board failed to consider evidence pertaining to government acquiescence; it placed too much weight on the absence of past torture, without taking into account evidence that Akosung avoided such harm by fleeing and going into hiding; and it limited its analysis to the threat of violence Akosung might face for resisting marriage, while overlooking the threat of violence, including possible rape, she would face if forced to marry.

## COUNSEL

Benjamin T. Wiesinger (argued), Pope & Associates PC, Phoenix, Arizona, for Petitioner.

Lindsay Pickell (argued), Attorney; Justin R. Markel, Senior Litigation Counsel; Carl H. McIntyre, Assistant Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

MILLER, Circuit Judge:

Yvette Akosung fled her Cameroonian village after she was ordered to marry the village chieftain, known as the Fon. For more than a year, she lived in hiding, moving from place to place to avoid capture. The Fon's envoys pursued Akosung and threatened punishment to anyone who harbored her. Akosung ultimately made her way to the United States, where she applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).

The immigration judge denied relief on all claims. The Board of Immigration Appeals then dismissed Akosung's appeal, prompting this petition for review. Because the Board's reasoning does not account for Akosung's credible testimony and otherwise rests on errors of law, we grant the petition for review and remand for further proceedings.

I

The immigration judge found Akosung to be credible, determining that her "testimony was believable, consistent, and sufficiently detailed to provide a plausible, coherent account of the basis for her fears." We therefore set out the facts as Akosung described them.

Akosung is a native and citizen of Cameroon. Now in her late twenties, she was born in a village in northwest Cameroon near the city of Bamenda. The village is ruled by an all-male council.

When Akosung was a young child, her father died, owing the Fon a debt that her family was unable to repay.

Near the end of 2013, the Fon died. Upon the accession of a new Fon, the council selected Akosung to marry the new Fon to settle her father's debt. The new Fon already had 40 or 50 other wives, and Akosung did not wish to join them. She stated that she did not love the new Fon and would not marry someone whom she did not love.

Akosung hoped that the council might change its mind, but around June 2015, a delegation from the Fon's palace arrived at her house to retrieve her for marriage. They brought ceremonial oil and a bracelet made of shells, which symbolized that Akosung would become a wife of the Fon. The custom was that once the bracelet was placed on a woman, she could not remove it.

Akosung's cousin advised her to run away. At the time, Akosung was attending school to get a degree in nursing. For the next two months, Akosung hid and attempted to continue her nursing studies, but it was risky for her to appear in public, so she could not always attend classes. During that time, she learned that her family was subject to an "injunction order," under which their properties and funds were seized, their crops were destroyed, and they were restricted from attending social activities. No one was permitted to talk to Akosung.

Around August 2015, Akosung fled to the city of Douala, a day's journey away, to hide with a relative. She hid in Douala for about a year. But even there, word spread that Akosung had refused to marry the Fon. The Fon had circulated an edict: "If [Akosung] is seen anywhere, she has to be taken back to the palace." When her relative heard the message, he asked Akosung to leave because he did not want to face the consequences of harboring her.

In September 2016, Akosung left Douala and went to stay with a friend in the city of Bafut, which was close to her home town. Almost immediately, word of her arrival leaked, and another delegation from the palace came to fetch her. Akosung's brother helped her resist capture. After a physical struggle, Akosung ran away and escaped to a city called Mamfe, on the border with Nigeria. Her cousin reported the altercation to the Bamenda police. The police said they could not help because the "[t]he traditional ruler has the final say," and the decision of the council "cannot be challenged before any authority."

Akosung stayed in Mamfe for about a month. With the help of a priest and a customs officer, she was able to cross the border into Nigeria, then travel through Mexico to Nogales, Arizona, where she arrived without documentation. She asked for protection at the port of entry.

The Department of Homeland Security initiated removal proceedings against Akosung. After a hearing, the immigration judge issued an oral decision denying her applications for asylum, withholding of removal, and protection under the CAT.

The Board dismissed Akosung's appeal. As to asylum and withholding of removal, the Board determined that Akosung had not shown "that she would be harmed upon return to Cameroon on account of her membership in the asserted particular social group of women resistant to forced marriage proposals" and that, in any event, she "could relocate to an area other than the small town where the fon lives." As to the CAT claim, the Board concluded that Akosung "did not establish that it is more likely than not that she will be tortured by, or 'at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" (quoting 8 C.F.R.

§ 1208.18(a)(1)); *see id.* § 1208.16(c). The Board also stated that Akosung had not experienced past torture and that she "could reasonably relocate to an area outside the fon's control, as she previously did for more than a year."

## II

We begin with the issue of relocation, which is common to all of Akosung's claims. The record reflects that Akosung attempted to hide from her pursuers in several different areas of Cameroon outside of her home village. In one instance, she was able to hide with a relative for about a year. But Akosung's ability to elude her pursuers at great effort and risk does not establish that she would be able to avoid persecution or torture by relocating within Cameroon.

The asylum regulation makes asylum unavailable if "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . and under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. § 1208.13(b)(1)(i)(B). The regulation governing withholding of removal contains similar text. *See id.* § 1208.16(b)(1)(i)(B). The CAT regulation does not bar relief if an applicant could relocate, but it nevertheless provides that assessing the likelihood of future torture requires considering "[e]vidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured." *Id.* § 1208.16(c)(3)(ii).

Unlike the asylum and withholding of removal regulations, the CAT regulation does not include a reference to the reasonableness of relocation, but we do not think that anything turns on the distinction here. The government does not suggest that the standards in the two regulations are different, and it does not rely on the absence of the word

"reasonable" in the CAT regulation. To the contrary, in its discussion of Akosung's CAT claim, the Board said that it thought she "could reasonably relocate," suggesting that it views reasonableness as an element of that regulation as well.

It hardly seems "reasonable to expect" one facing persecution or torture to become a fugitive and live in hiding. 8 C.F.R. § 1208.13(b)(1)(i)(B); *see Doe v. Attorney Gen. of the United States*, 956 F.3d 135, 154 (3d Cir. 2020). But even setting that aside, we do not believe that an applicant can be said to have the ability to "relocate" within her home country if she would have to remain in hiding there. As a practical matter, a living arrangement that involves hiding from the authorities is necessarily impermanent. When used intransitively, "relocate" most naturally refers to resettlement or a change of residence, not the unstable situation of one who must always be ready to flee. *See Oxford English Dictionary* (3d ed. 2009), https://www.oed.com/view/Entry/162002 ("[t]o move to a new location, esp. in order to work; to resettle"); *Random House Webster's Unabridged Dictionary* 1628 (2d ed. 2001) ("to change one's residence or place of business; move"). Moreover, living in hiding does little to establish that a person is able to "avoid future persecution," 8 C.F.R. § 1208.13(b)(1)(i)(B), or "is not likely to be tortured," *id.* § 1208.16(c)(3)(ii). To the contrary, a person who lives in hiding does so precisely because she continues to be in danger of being captured and returned to face persecution or torture. We therefore agree with other circuits that have held that "[r]elocating to another part of the country does not mean living in hiding." *Agbor v. Gonzales*, 487 F.3d 499, 505 (7th Cir. 2007); *accord Singh v. Sessions*, 898 F.3d 518, 522 (5th Cir. 2018); *Essohou v. Gonzales*, 471 F.3d 518, 522 (4th Cir. 2006).

The government contends that Akosung failed to exhaust the argument that hiding does not amount to relocation. To the contrary, Akosung argued to the Board that "there is no safe place for [her] to internally relocate" because she would be "hunted down" no matter her location. She emphasized that the Fon's orders were sent throughout the region, making stable relocation impossible. And the Board considered and rejected Akosung's argument, concluding that she had relocated by remaining hidden in Douala for a year. *See Socop-Gonzalez v. INS*, 272 F.3d 1176, 1186 (9th Cir. 2001) (en banc) (explaining that the exhaustion requirement is satisfied if the Board in fact considered an issue).

On the merits, the record does not support the Board's conclusion. We review the agency's factual findings for substantial evidence and may set aside a factual determination only if the record compels a contrary conclusion. 8 U.S.C. § 1252(b)(4)(B); *see INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1 (1992). But even under that deferential standard, the agency's conclusion is unsustainable.

Akosung's credible and unrebutted testimony establishes that, during the period after she left home, she was hiding in fear of her life and of being captured and taken to the palace for a forced marriage. The Board relied on Akosung's longest stay, with her relative in Douala, but the relative made Akosung leave when he learned that he would face consequences for harboring her. Akosung's living situations were temporary and, in at least one instance, so precarious that she had to engage in a physical struggle in order to escape. The record does not demonstrate any safe relocation in a place where the Fon's writ did not run. *See Arrey v. Barr*, 916 F.3d 1149, 1161 (9th Cir. 2019). Because substantial

evidence does not support the Board's conclusion, we remand for further consideration.

## III

In rejecting Akosung's claims for asylum and withholding of removal, the Board also relied on its determination that she did not belong to a group that Cameroonian society recognizes as socially distinct and, accordingly, that she could not show a well-founded fear of persecution based on a protected ground. Because the record cannot sustain the Board's analysis of social distinction, we grant the petition and remand on that issue as well.

To establish eligibility for asylum, an applicant must demonstrate that she is a "refugee," 8 U.S.C. § 1158(b)(1)(B)(i), which the Immigration and Nationality Act defines as a person who is unable or unwilling to return to her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(a)(42); *see also* 8 C.F.R. § 1208.16(b) (similar standard for withholding of removal). The Board has previously interpreted the phrase "particular social group" to refer to a group that is "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (B.I.A. 2014). We have upheld the Board's interpretation as a reasonable resolution of statutory ambiguity that is entitled to deference under *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). *See Garay Reyes v. Lynch*, 842 F.3d 1125, 1136–37 (9th Cir. 2016).

Although the Board has sometimes referred to the requirement of social distinction in terms of "social

visibility," the Board clarified in *Matter of M-E-V-G-* that "social visibility does not mean 'ocular' visibility." 26 I. & N. Dec. at 240. "To be socially distinct," the Board explained, "a group need not be seen by society; rather, it must be perceived as a group by society." *Id.* It therefore is not necessary that people in the society be "able to identify the group's members on sight." *Id.*

In this case, the Board adopted the immigration judge's finding that "women resistant to forced marriage proposals" are not a socially distinct group. The immigration judge found it "difficult . . . to find how anyone in society would be able to demonstrate or recognize [Akosung] as an individual who has declined a marriage proposal from a fon." To the extent that that finding rests on a requirement of ocular visibility, it is inconsistent with *Matter of M-E-V-G-*.

But even if we construe the Board's statement as a determination that the group is not regarded as distinct in Cameroonian society, that determination appears to be inconsistent with Akosung's testimony. Akosung described experiencing ostracism while fleeing the Fon; for example, her relative asked her to leave Douala because he could be fined for harboring her. She also testified that the Fon had the power to enforce traditional laws and customs in other towns and villages, even without a physical presence in those places. That power was demonstrated in the case of another woman Akosung described who was successfully hunted down after refusing to marry the Fon. Akosung's testimony suggests that the status of a woman resisting a forced marriage was recognized as distinct "within the society in question," and the Board should have taken it into account. *Matter of M-E-V-G-*, 26 I. & N. Dec. at 237; *see Flores Rios v. Lynch*, 807 F.3d 1123, 1127 (9th Cir. 2015).

The government does not defend the Board's social-distinction analysis on the merits but argues instead that Akosung has waived any challenge to the Board's determination by redefining her proposed social group in her briefs to this court. We disagree. Both the immigration judge and the Board evaluated the proposed particular social group of "women resistant to forced marriage proposals." Before the Board, Akosung proposed what the Board characterized as "variations on" that group, and in this court, Akosung characterized the group as "single, childless women in Cameroon"—that is, the class of people who, by custom, are eligible to be selected as wives of the Fon. Akosung argued that "[n]one of these proposed social groups are any different than others because . . . the *only people* in Cameroon who must resist forced marriage are single, childless women." Although Akosung's brief could have been clearer on the point, we conclude that her challenge to the Board's social-distinction analysis was sufficiently presented to permit our review. *See Guo v. Ashcroft*, 361 F.3d 1194, 1199 (9th Cir. 2004). We leave it up to the Board on remand to decide whether it should exercise its discretion to consider the cognizability of Akosung's social group as she now articulates it, or else address the proposed social group it considered previously.

## IV

Under the CAT regulations, the applicant bears the burden of establishing that "it is more likely than not that he or she would be tortured if removed." 8 C.F.R. § 1208.16(c)(2). In rendering its decision, the Board must consider "all evidence relevant to the possibility of future torture." 8 C.F.R. § 1208.16(c)(3); *see Parada v. Sessions*, 902 F.3d 901, 914–15 (9th Cir. 2018). In addition to the potential for relocation, the Board offered several additional

rationales for denying CAT relief. They are flawed in three respects.

First, the Board stated that Akosung did not show that any torture would be "by, or 'at the instigation of or with the consent or acquiescence of a public official.'" (quoting 8 C.F.R. § 1208.18(a)(1)); *see id.* § 1208.16(c). As reflected in the regulation that the Board quoted, torture can occur even if a government official does not commit the act directly. The regulation requires only official acquiescence, which exists when government officials "were aware of the torture but 'remained willfully blind to it, or simply stood by because of their inability or unwillingness to oppose it.'" *Bromfield v. Mukasey*, 543 F.3d 1071, 1079 (9th Cir. 2008) (quoting *Ornelas-Chavez v. Gonzalez*, 458 F.3d 1052, 1060 (9th Cir. 2006)); *see* 8 C.F.R. § 1208.18(a)(7).

To the extent the Board analyzed the issue at all, its recitation of the regulatory text provides no reasoned consideration of government acquiescence. Because the Board's decision "relies in part on the immigration judge's reasoning," we may review both decisions, but the immigration judge's decision is no sounder than the Board's. *Jagtar Singh v. Holder*, 753 F.3d 826, 830 (9th Cir. 2014) (quoting *Flores-Lopez v. Holder*, 685 F.3d 857, 861 (9th Cir. 2012)). The immigration judge reasoned that Akosung "has not testified that she is being sought to be harmed by any type of member of the actual Cameroonian government." Instead, she "simply fears some private actors such as her tribal elders and the fon . . . . These are not official government members." Even assuming that the Fon is not himself a government official, the immigration judge's analysis says nothing about the prospect of torture with the *acquiescence* of a government official.

Although neither the immigration judge nor the Board discussed it, the record shows that local police were aware of the Fon's edicts and refused to interfere with traditional customs, including forced marriage. Akosung's credible testimony establishes that the village council's decisions have the force of law and that local police believe they "cannot be challenged." The Board erred by failing to "give reasoned consideration to that evidence." *Cole v. Holder*, 659 F.3d 762, 772 (9th Cir. 2008).

Second, the Board emphasized that Akosung "has not experienced past torture." Past torture is a relevant consideration in deciding whether an applicant faces a likelihood of future torture. 8 C.F.R. § 1208.16(c)(3)(i); *see Kamalthas v. INS*, 251 F.3d 1279, 1284 (9th Cir. 2001). We have explained that "past torture is ordinarily the principal factor on which we rely when an applicant who has previously been tortured seeks relief under the Convention." *Nuru v. Gonzales*, 404 F.3d 1207, 1218 (9th Cir. 2005). But we have never held that CAT relief requires a finding of past torture. The plain text of the regulation does not impose such a requirement, but instead identifies evidence of past torture as one item in a non-exclusive list of relevant factors.

We do not question that there are cases in which the lack of past torture makes it less reasonable to believe that future torture is likely. But here, Akosung's credible testimony established that the only reason she evaded physical attacks, or any other harm from a forced marriage, is that she hid and resisted capture by the Fon's forces. When an applicant flees and goes into hiding to avoid torture, it can hardly be said that the absence of past harm negates the likelihood of future torture. The Board ignored that highly probative and unrefuted evidence in assessing Akosung's CAT claim. *See Cole*, 659 F.3d at 772.

Third, the Board limited its analysis to the threat of violence Akosung might face for resisting marriage to the Fon, while overlooking the threat of violence she would face if forced to marry him. We have previously held that "[r]ape can constitute torture . . . [because it] is a form of aggression constituting an egregious violation of humanity." *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1079 (9th Cir. 2015) (ellipsis in original) (quoting *Zubeda v. Ashcroft*, 333 F.3d 463, 472 (3d Cir. 2003)); *see Xochihua-Jaimes v. Barr*, 962 F.3d 1175, 1183 (9th Cir. 2020) (relying on *Avendano-Hernandez* to conclude that "[r]ape and sexual assault may constitute torture"). Here, the Board did not consider the likelihood of rape at all, even though it is an obvious concomitant of a forced marriage.

The government does not argue that marital rape should be treated differently from other forms of sexual violence, nor could it plausibly do so. Instead, it contends that Akosung did not exhaust the argument before the agency. But in her testimony, Akosung described herself as having been "traumatized" by the prospect of a forced marriage to the Fon, and she left little doubt about why. She recounted in detail the example of another woman who had refused marriage to the Fon, left the village, and married someone else. Akosung repeatedly described how that woman was tracked down and forced to return to the palace, abandon her husband, and bear three of the Fon's children. Akosung further testified about girls who were forced into marriage once they were of childbearing age. The implication of her testimony was clear.

Beyond her testimony, Akosung's brief to the Board emphasized "the life of slavery led by those females taken as wives of the Fon." Akosung's brief also underscored "the grave threat to her life and freedom of being a slave-wife if

she ever entered the Fon's palace." That was sufficient to put the Board on notice of the issue. *See Figueroa v. Mukasey*, 543 F.3d 487, 492 (9th Cir. 2008). On remand, the Board should consider the threat of rape in assessing whether Akosung has established that she would be more likely than not to be tortured if returned to Cameroon.

**PETITION GRANTED and REMANDED**.