**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1439

ROSA DEL CARMEN ORTEZ-CRUZ,

Petitioner,

v.

WILLIAM P. BARR, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: October 30, 2019                         Decided: February 26, 2020

Before DIAZ, HARRIS, and RUSHING, Circuit Judges.

Petition for review granted in part, denied in part, and remanded by published opinion. Judge Diaz wrote the opinion, in which Judge Harris and Judge Rushing joined.

**ARGUED:** Jeremy Layne McKinney, MCKINNEY IMMIGRATION LAW, Greensboro, North Carolina, for Petitioner. Ann M. Welhalf, UNITED STATES DEPARMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Ann Marie Dooley, Jesse Simon vanVoorhees Taft, MCKINNEY IMMIGRATION LAW, Greensboro, North Carolina, for Petitioner. Joseph H. Hunt, Assistant Attorney General, Stephen J. Flynn, Assistant Director, Kathryn M. McKinney, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

DIAZ, Circuit Judge:

Rosa Del Carmen Ortez-Cruz, a Honduran native and citizen, seeks both withholding of removal and protection under the Convention against Torture (the "CAT"). If repatriated, she fears that her abusive ex-partner may try to kill her although he hasn't contacted her in many years.

Because Ortez-Cruz has suffered past persecution due to her membership in particular social groups, the Board of Immigration Appeals recognized that she is entitled to a presumption that her life or freedom will be threatened if she returns to Honduras (the "future-threat presumption"), as required to qualify for withholding of removal. The Board found that the government rebutted this presumption, however, by proving two conditions: that Ortez-Cruz's circumstances had fundamentally changed—i.e., that her ex-partner no longer posed a threat—and that Ortez-Cruz can avoid harm by relocating within Honduras. On these two alternative grounds, the Board denied withholding of removal. The Board also denied her CAT claim.

We conclude that the Board erred in finding that the government rebutted the future-threat presumption. It was the government's burden to prove either condition that rebuts the presumption, and the record doesn't support a finding that it did so. Accordingly, we vacate the Board's denial of withholding of removal and remand with instructions that the agency grant relief on that claim. We affirm the Board's denial of Ortez-Cruz's CAT application, however, because the record supports the Board's finding that she didn't meet the burden of proof for that claim.

## I.

Ortez-Cruz entered this country illegally in or around January 2002. In September 2013, the Department of Homeland Security charged her with removability and issued a notice to appear for a hearing. Ortez-Cruz conceded removability and applied for withholding of removal and for protection under the CAT.[1]

Ortez-Cruz testified through an interpreter at two hearings before an Immigration Judge ("IJ").[2] We begin by summarizing the testimony and evidence and then describe the IJ's and the Board's decisions.

## A.

Ortez-Cruz met her former partner, Jose Genaro Auceda, in 1997, in Tegucigalpa, Honduras, when she was sixteen years old and he was about twenty-seven. They began a relationship, moved in together, and had a son named Anthony. Auceda was controlling and a heavy drinker. He would sometimes brandish his knife around her when drunk. One time, he made her sit still on a chair while he emptied a two-liter soda bottle on her and "pass[ed] his knife around [her] head and [her] shoulders." A.R. 243. Another time, he kicked her in the lower back and accused her of having an affair. She then left him for a few days, renting a house a half-hour drive away from where Auceda lived, until he found

---

[1] Had Ortez-Cruz applied for asylum, her application would have been untimely. *See* 8 U.S.C. § 1158(a)(2)(B).

[2] Ortez-Cruz successfully moved for the IJ who presided over her first hearing to recuse himself, which led to the second hearing before a different IJ.

3

her and convinced her to return. She returned only because she was afraid that he would do something worse to her if she didn't. In 1999, the couple moved to San Pedro Sula, Honduras.

According to Ortez-Cruz, Auceda (while in a drunken rage) stabbed her in the abdomen in December 2000. She fell down and he then straddled her, brandished his knife, threatened to kill her, said that "if you're not mine, you're not going to be anyone else's," and stabbed her in her right arm near her elbow. A.R. 249. Her younger sister Ana (who lived with them at the time) took her to the hospital, where she stayed for weeks. Hospital records show that she had surgery to repair her abdomen wound.

Afterward, Ortez-Cruz lived with her sisters in Tegucigalpa (a four-hour drive from where she had lived with Auceda) for eight months while she recovered from her wounds. Auceda didn't know where her sisters lived, and he didn't contact Ortez-Cruz or her family during this time. Ortez-Cruz didn't report the attack to the police because she thought they would do nothing, she did not want to hurt Auceda's aging mother, and she feared that Auceda could retaliate by harming her family. Other than Ana, Ortez-Cruz never told her family about the stabbing because they liked Auceda and she feared they might defend him.

Ortez-Cruz then worked in Mexico briefly before entering the United States, in January 2002. She left her son Anthony with her mother in San Lorenzo, Honduras, a five-hour drive from San Pedro Sula (where she had lived with Auceda) and a three-hour drive from Tegucigalpa (where she suspects Auceda moved after the stabbing). Anthony lived

4

there for four years before coming to the United States, during which time Auceda did not try to see him or gain custody.

After moving to this country, Ortez-Cruz lived briefly with a cousin in Virginia and then in Washington, D.C. In 2003, a friend named Leticia told her that Auceda was in Virginia looking for her and had said that if he found Ortez-Cruz and her new partner, he would kill them both. In late 2003 or early 2004, Leticia told Ortez-Cruz that Auceda had been deported to Honduras. Ortez-Cruz offered no other evidence that Auceda had ever come to the United States. She also didn't know Leticia's last name, said that she had lost touch with Leticia years ago, and produced no evidence corroborating Leticia's existence. At some point after this, Ortez-Cruz moved to North Carolina.

According to Ortez-Cruz, Auceda sent her and Anthony a Facebook message a few weeks before her hearing, in 2016. They both ignored the messages. This was the only time Auceda had contacted her since she left him in December 2000 (although Auceda had sent other Facebook messages to Anthony), and she had not seen him since then. She didn't bring evidence of this Facebook message to her hearing, explaining that she didn't have her phone with her because she was told that she could not use it in the courtroom. The IJ invited her to go to her car and get her phone, but there is no indication that she did so.

Ortez-Cruz fears that if she returned to Honduras today, Auceda would kill her. He frequently told her that if she was not his, she would not be anybody else's. Her mother has heard that Auceda remains in Honduras, but Ortez-Cruz has no other evidence of his

5

location.  When asked where she would go in Honduras if she returned, she stated, "[a]fter so many years of not being there, I do not have another house to go except my mother's."  A.R. 262.  Her mother still lives in San Lorenzo.  Auceda knows where her mother lives but has not contacted her since Ortez-Cruz left Honduras.  On cross-examination, the government highlighted the lack of corroboration for Ortez-Cruz's assertions that Auceda came to the United States in 2003 and recently contacted her on Facebook.

Julie Owens, a domestic-violence and post-traumatic stress disorder ("PTSD") expert, testified on Ortez-Cruz's behalf.[3]  She explained that she had conducted a Mosaic assessment (a "well-established scientific threat assessment" tool) and determined that this case "demonstrated extreme threat and potential for ongoing threat . . . [b]ecause domestic violence is a pattern of increasing frequency and severity over time, and the trajectory in this case ended in an attempted murder."  A.R. 293.  Therefore, in her view, "the only place for this to go would be to murder."  A.R. 293.

The IJ asked Owens how Auceda's drunkenness during his abuse should affect his analysis of the threat Auceda poses in the future.  Owens replied that Ortez-Cruz "was beaten every week on a regular basis, and it escalated in frequency and severity."  A.R. 294.  Further, Auceda told Ortez-Cruz that he would kill her if she ever left him, and there was no indication that he was ever held accountable for his actions.  Thus, Owens opined, Auceda would likely try to kill Ortez-Cruz if he had the opportunity.

---

[3] Ortez-Cruz was previously diagnosed with PTSD stemming from Auceda's abuse.

The IJ then noted that almost sixteen years had passed since Auceda's abuse, there was no corroboration that he had ever come to the United States, and he had not tried to contact Ortez-Cruz's family in Honduras. In response, Owens stated that "we don't have evidence to suggest that this particular abuser has gotten any kind of intervention or that there's any evidence that he would be any less dangerous." A.R. 295. She also observed that Honduras is smaller than North Carolina in terms of land and that, in her thirty years of experience, she had seen women living in North Carolina be stalked from the other side of the state and even from other states. Additionally, she knew of cases where abusers murdered women after twenty-eight years of no contact. Without evidence that Auceda has been rehabilitated, he must be considered a lethal threat, in Owens's view. Further, Auceda's lack of contact with Ortez-Cruz's family is typical of serial abusers. Such abusers often present a different persona to their victim's family and friends so that family and friends may trust the abuser and reveal information about the victim's location.

Next, Owens discussed the conditions in Honduras. One study suggests that ninety-six percent of murders of women are not prosecuted. Victims generally do not report domestic violence because they are intimidated and the police lack resources to prosecute abusers. Accordingly, victims in Honduras "are not considered safer if they move to another part of the country." A.R. 299.

Finally, when asked why Ortez-Cruz was able to recall incidents of abuse during her testimony that she had failed to include in her previously filed declaration, Owens testified that many victims of severe violence suffer psychogenic amnesia (i.e., amnesia

7

absent a known neurological cause). Questioning victims about their experiences may trigger painful memories that they had previously repressed.

The government then briefly cross-examined Owens, who admitted that she had never been to Honduras, had not researched Honduras much, and knew nothing about Auceda other than what Ortez-Cruz has told her. Ortez-Cruz's counsel then gave a brief closing argument, the government waived its closing, and the IJ adjourned the hearing.

B.

The IJ issued a decision finding that Ortez-Cruz failed to qualify for relief. Despite some issues with her testimony, the IJ found her credible regarding Auceda's abuse, except for her statement that Auceda had threatened to kill her when he stabbed her (which Ortez-Cruz had omitted from the declaration she filed with her application). But in the IJ's view, much of her testimony regarding her fear of future persecution was too speculative to be given much weight. For example, the IJ stressed that there was no corroborating evidence as to Auceda's whereabouts or that he had entered the United States in 2003.

The IJ also assigned little probative value to Owens's testimony because it rested "on a false assumption that [Auceda] never rehabilitated" and because her knowledge of Honduran law enforcement's ineffectiveness in preventing domestic violence was limited to "a few" cases that she had studied. A.R. 103–04. The IJ reasoned (incorrectly) that "the burden is on [Ortez-Cruz] to prove [Auceda's] dangerousness," and it was thus insufficient for Owens to testify that she "lacks any reason to believe" Auceda had been rehabilitated. A.R. 104. He instead found that Auceda "may have rehabilitated through numerous

8

experiences, *inter alia*, a conviction for harming another partner, reflection and repentance, [and] maturation or some other life changing development." A.R. 104. Thus, he stated, "the Court possesses an ambiguous record regarding [Auceda's] current intentions to harm [Ortez-Cruz]." A.R. 104.

Next, the IJ assumed without deciding that Ortez-Cruz's particular social groups— "Honduran women in domestic relationships who are unable to leave the domestic relationship" and "women who are viewed as property by virtue of their position in the domestic relationship"—qualify for protection. A.R. 106. He further assumed that Ortez-Cruz was persecuted because of her membership in those groups. This triggered the future-threat presumption, which may be rebutted if the government shows by a preponderance of the evidence that *either*:

> (A) There has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds mentioned in this paragraph upon the applicant's removal to that country; or
>
> (B) The applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so.

8 C.F.R. § 1208.16(b)(1)(i)(A), (B).

The future-threat presumption is "based on 'the possibility that a persecutor, once having shown an interest in harming the applicant, might seek to harm the applicant again should the applicant be forced to return within the persecutor's reach.'" *Matter of A-T-*, 24 I. & N. Dec. 617, 618 (A.G. 2008) (quoting *Matter of N-M-A-*, 22 I. & N. Dec. 312, 317–

9

18 (B.I.A. 1998)). "In essence, the 'past serves as an evidentiary proxy for the future.'" *Id.* (quoting *Matter of N-M-A-*, 22 I. & N. Dec. at 318).

The IJ found that the government rebutted the presumption in both ways: circumstances had fundamentally changed since Auceda had last harmed Ortez-Cruz, and Ortez-Cruz could avoid a future threat by relocating to her mother's house or another place in Honduras (and it would be reasonable to expect her to do so). As to changed circumstances, the IJ concluded that Auceda had not contacted Ortez-Cruz for over fifteen years, choosing not to credit her claims that Auceda came to the United States in 2003 and sent her a Facebook message in 2016. Further, the IJ deemed it significant that Auceda had not contacted Ortez-Cruz during the eight months she lived with her sisters, nor had he tried to harm Anthony when Anthony lived with Ortez-Cruz's mother in southern Honduras. In the IJ's view, these facts contradicted Ortez-Cruz's claim that Auceda still had an interest in her. The IJ also found that Ortez-Cruz "possesses other protective factors to keep her safe from [Auceda] in the future, including a place to live in Honduras with her mother, the ability to work, and work experience in both Honduras and the United States." A.R. 108.

As to relocation, the IJ found "insufficient evidence that [Auceda] would find [Ortez-Cruz] if she moved farther away to another part of Honduras, such as the southern part of the country where her mother and father live." A.R. 109. He emphasized that Auceda had never contacted Ortez-Cruz's mother or father even though he knew where they lived. He also found that Ortez-Cruz "stated that she could live with her mother if she

10

returned to Honduras," and thus it was reasonable to expect Ortez-Cruz to relocate there or to another place in Honduras.[4]  A.R. 109.  Accordingly, the IJ held that (1) Ortez-Cruz "failed to meet her burden to establish by a clear probability that her life or freedom will be threatened" and (2) the government rebutted the future-harm presumption.  A.R. 109.

For the same reasons, and because Ortez-Cruz had not established that the Honduran government was unwilling to protect her from torture, the IJ also denied Ortez-Cruz's CAT claim.  That claim required her to show that it is more likely than not that, if she were removed, she would be tortured with the consent or acquiescence of the Honduran government.  The IJ found that, while violence against women is a problem in Honduras, Ortez-Cruz did not face a particularized risk upon return.  In his analysis of Ortez-Cruz's CAT claim, the IJ noted that the "record is inconclusive as to whether [Auceda] would seek [Ortez-Cruz] if she lived in southern Honduras with her mother or in another area of the country."  A.R. 112.

The Board affirmed the IJ's findings and dismissed Ortez-Cruz's appeal.  The Board also noted that the government did not challenge the IJ's assumption that Ortez-Cruz's particular social groups were cognizable.  Thus, the Board deemed the issue waived.[5]

---

[4] The IJ based this finding on Ortez-Cruz's statement that "[a]fter so many years of not being there, I do not have another house to go except my mother's."  A.R. 262.  This statement did not indicate that she could reasonably relocate elsewhere in Honduras.

[5] At oral argument, the government confirmed that it has abandoned this issue on appeal.  We thus decline to consider whether Ortez-Cruz's proposed social groups are cognizable in light of *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018), which was issued shortly after the Board's decision in this case.

Ortez-Cruz timely petitioned this court for review.

## II.

The issues before us on appeal are whether the Board erred by denying Ortez-Cruz's withholding of removal and CAT claims. "When, as here, the [Board] affirms the IJ's decision with an opinion of its own, we review both decisions." *Salgado-Sosa v. Sessions*, 882 F.3d 451, 456 (4th Cir. 2018). The Board's determinations that the future-threat presumption was rebutted and that Ortez-Cruz failed to meet her burden as to her CAT claims are factual findings, *see Dong v. Sessions*, 743 F. App'x 513, 519 (4th Cir. 2018) (unpublished) (citing *Essohou v. Gonzalez*, 471 F.3d 518, 520 (4th Cir. 2006)), which we must accept "unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B).

While our review is deferential, it's not toothless. "[I]n reviewing agency decisions in immigration matters, it is 'our responsibility to ensure that unrebutted, legally significant evidence is not arbitrarily ignored by the factfinder.'" *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011) (quoting *Baharon v. Holder,* 588 F.3d 228, 233 (4th Cir. 2009)). "Hence, an IJ is not entitled to 'base a decision on only isolated snippets of the record while disregarding the rest.'" *Id.* (alterations adopted) (quoting *Baharon*, 588 F.3d at 233). "Nor may the IJ 'distort or disregard important aspects of the alien's claim,' make rulings that are based 'on an inaccurate perception of the record,' or 'rely on speculation, conjecture, or an otherwise unsupported personal opinion to discredit an applicant's testimony or her

12

corroborating evidence.'" *Id.* (alterations adopted) (quoting *Jian Tao Lin v. Holder*, 611 F.3d 228, 237 (4th Cir. 2010)).

## A.

We first consider Ortez-Cruz's withholding of removal claim. Entitlement to withholding of removal requires a "clear probability" that a refugee's "life or freedom would be threatened" on account of a protected ground if she were sent back to her home country. *Anim v. Mukasey*, 535 F.3d 243, 252–53 (4th Cir. 2008). The applicant typically bears the burden of proving this. *See id.* But here, the future-threat presumption shifted the burden to the government, which was then required to establish (by a preponderance of the evidence) one of the two conditions that will rebut the presumption. *See* 8 C.F.R. § 1208.16(b)(1)(i). The question here is whether the government met that burden as to either condition.

Ortez-Cruz proposes a bright-line rule: the government *cannot* meet its burden to rebut the future-threat presumption where it produces no relevant evidence and makes no argument. This proposed rule is overbroad. There may be cases where the Board can rely solely on the applicant's own evidence (or her testimony on cross-examination) in finding one of the two conditions that rebut the presumption. For example, if Ortez-Cruz had testified that Auceda was dead, a "fundamental change of circumstances" finding obviously would be proper—even without evidence or argument from the government—because the record would point unambiguously in that direction.

13

However, this isn't one of those cases. As the IJ recognized in his opinion, the record was "ambiguous" and "inconclusive" as to whether either condition—(1) a fundamental change in circumstances or (2) that Ortez-Cruz could safely relocate within Honduras—was met. A.R. 104, 112. That's not good enough. To rebut the presumption, the government must prove that its view of the evidence as to either condition is the most convincing one. *See Dong*, 743 F. App'x at 521 (stating that the government must prove its view of the evidence is "*more* probable" than the applicant's alternative explanation, and the IJ must offer a "reasoned explanation" for why the government's view of the evidence is "*more* convincing than plausible inferences pointing in the other direction") (citations omitted)); *see also Singh v. Sessions*, 898 F.3d 518, 521–23 (5th Cir. 2018) (vacating the Board's finding of rebuttal because the government had not produced any evidence on the issue and its argument was perfunctory). As we explain, the government failed to do that here. Any reasonable adjudicator would be compelled to come to that conclusion.

We address each condition in turn. Because the Board affirmed the IJ's findings without providing further analysis, we focus on the IJ's opinion.

1.

In finding a fundamental change in circumstances since Auceda last harmed Ortez-Cruz, the IJ relied on two key inferences it drew from the evidence.

First, the IJ inferred that Auceda no longer had an interest in Ortez-Cruz—even though he had previously threatened to kill her if she left him—simply because he had not

14

contacted her or her family in over fifteen years. Auceda's lack of contact, standing alone, doesn't rebut the presumption. There are plausible alternative explanations for it. For example, Auceda may not know how to contact Ortez-Cruz. Reaching her in the United States might not seem feasible. He might not have contacted her family because he presents a different persona to them, as is typical of serial abusers (according to Owens), or because he believed that it wouldn't help him reach her in the United States. *Cf. Tchemkou v. Gonzales*, 495 F.3d 785, 794 (7th Cir. 2007) (stating that the treatment of the petitioner's family members does not "speak to how [the petitioner] would be treated upon her return" because they had not participated in the protests that the petitioner had).

In the context of this case, the government failed to show that the passage of fifteen years meant Auceda had lost interest in Ortez-Cruz. Owens testified to the contrary and referenced cases where serial abusers murdered women after twenty-eight years without contact. No record evidence rebutted her testimony. Accordingly, the IJ should have given it weight in assessing whether Auceda posed a continuing threat. *See Baharon,* 588 F.3d at 233 (stating that an IJ may not arbitrarily ignore unrebutted, legally significant evidence). To the extent the IJ disregarded Owens's testimony on the basis that she didn't personally interview Auceda, that was error. Expert testimony often extrapolates from general knowledge; it can't be ignored for that reason alone.

In any event, it's the government's burden to prove that the *most likely* explanation for Auceda's lack of contact is that he had lost interest in Ortez-Cruz. *See Dong*, 743 F. App'x at 521. The government didn't do so. In fact, the IJ appeared to recognize this by

15

finding that the record was "ambiguous" as to Auceda's "current intentions to harm" Ortez-Cruz. A.R. 104. Faced with such ambiguity, any reasonable adjudicator would have been compelled to use Auceda's past abuse "as an evidentiary proxy for the future," *Matter of A-T-*, 24 I. & N. Dec. at 618 (quoting *Matter of N-M-A-*, 22 I. & N. Dec. at 318), and presumed that he remained a threat.

In reaching the wrong conclusion, the IJ made several missteps. *First*, the IJ faulted Owens for assuming that Auceda hadn't been rehabilitated, stating that "the burden is on [Ortez-Cruz] to prove [Auceda's] dangerousness." A.R. 104. This is incorrect. Once the presumption applied, it was the government's burden to show that Auceda was no longer dangerous. *Second*, the IJ concluded that Ortez-Cruz "did not sufficiently corroborate her potential for future persecution," but she has no burden to do so. A.R. 102–03. The IJ was required to presume that she faced future harm unless the government proved otherwise. And *third*, the IJ's opinion is littered with citations to cases in which the *applicant* bore the burden of proof, without any acknowledgment that these cases might be distinguishable. *See, e.g.*, A.R. 108 (citing *Salem v. Holder*, 647 F.3d 111, 115 (4th Cir. 2011); *Matter of A-M-*, 23 I. & N. Dec. 737, 740–41 (B.I.A. 2005)).

It will sometimes be difficult for the government to prove that an individual in another country no longer poses a threat. But that is consistent with the presumption. It puts a thumb on the scale for applicants who show past harm. A lack of proof as to whether Auceda retains interest in Ortez-Cruz can't be held against her. *See Bace v. Ashcroft*, 352 F.3d 1133, 1140 (7th Cir. 2003). And there are ways in which the government could have

16

shown that Ortez-Cruz's circumstances had fundamentally changed. For example, it could have tried to find information about Auceda online; demonstrated that Honduran law enforcement has improved at protecting domestic-violence victims; elicited testimony from Owens (or cited documentary evidence, if it exists) about the statistical unlikelihood of an abuser harming a previous victim after decades without contact; or called its own expert to testify to that effect.

The second inference that the IJ relied on in finding a fundamental change in circumstances was that Ortez-Cruz "possesses other protective factors to keep her safe from [Auceda] in the future, including a place to live in Honduras with her mother, the ability to work, and work experience in both Honduras and the United States." A.R. 108. These factors, however, are relevant only in that they may enable Ortez-Cruz to relocate within Honduras, an issue we address next.

2.

The IJ found that the government established that Ortez-Cruz could safely relocate to southern Honduras, where her mother lives. He inferred that Auceda would not reach her there because Auceda didn't find Ortez-Cruz in the eight months when she lived with her sisters in Tegucigalpa, has never contacted her mother (despite knowing where she lives), and didn't harm his son Anthony in the four years when he lived with Ortez-Cruz's mother. These facts, standing alone, do not rebut the presumption. That is, no reasonable adjudicator could find that these facts establish (by a preponderance of the evidence) that Ortez-Cruz "could avoid a future threat to [] her life or freedom by relocating" within

17

Honduras and that it would be reasonable to expect her to do so. 8 C.F.R. § 1208.16(b)(1)(i)(B).

In assessing whether Ortez-Cruz can safely relocate within Honduras, the appropriate question is whether Auceda would threaten her *at some point* in the future. The threat need not be imminent. *See id.* § 1208.16(b) (setting no time limit for threats to the applicant); *Kone v. Holder*, 596 F.3d 141, 149 (2d Cir. 2010) (stating that "[n]othing in the regulations requires an applicant to show that she would be immediately persecuted upon return, that persecution would be likely to occur within some short time span, or that it would occur in regular intervals"). The government must show that, if Ortez-Cruz relocates, it's more likely than not that Auceda won't threaten her for the rest of her life. When viewed through this lens, the evidence relied on by the IJ does not meet the government's burden.

As explained above, Auceda's lack of contact with her family isn't very probative. Her family is differently situated from her. *See Tchemkou*, 495 F.3d at 794. Abusers can retain interest in victims despite many years without contact, according to Owens. Auceda also knows where Ortez-Cruz's mother lives, so she can't reasonably be expected to be safe there. Additionally, her work experience may help her move to different parts of Honduras, but it's not probative as to whether she would be safe from Auceda.

Nor does the eight-month period when Ortez-Cruz lived safely with her sisters show that she can safely relocate. Just as safe return trips to the applicant's home country don't "negate the potential of future harm," *Kone*, 596 F.3d at 149, neither do brief periods of

18

safe living. Further, Ortez-Cruz was in hiding when she lived with her sister. It's not reasonable to expect her to live in hiding for the rest of her life. *See Singh*, 898 F.3d at 522 n.13 (collecting cases); *Essohou*, 471 F.3d at 522. And Auceda previously found her when she relocated briefly within Honduras. Honduras is a small country—smaller than North Carolina—so it may not be overly difficult for Auceda to track her down at some point in her life. And Owens testified that serial abusers can travel great distances in pursuit of victims. The IJ disregarded that part of her testimony, we think arbitrarily.

Two other errors helped lead the IJ to the wrong conclusion. *First*, as with his changed-circumstances analysis, the IJ incorrectly placed the burden on Ortez-Cruz. For example, he stated that there was "insufficient evidence" that Auceda would find her, A.R. 109, when the question should have been whether sufficient evidence showed that Auceda would *not* find her. He also found that the "record is inconclusive as to whether [Auceda] would seek [Ortez-Cruz] if she lived in southern Honduras with her mother or in another area of the country," yet he ruled for the government. A.R. 112. If the record is inconclusive, then the government didn't meet its burden. And *second*, the IJ mistakenly found that Ortez-Cruz admitted that she could live safely with her mother, when she instead said that she had nowhere to go in Honduras except her mother's house.

The facts of this case are analogous to those in *Arrey v. Barr*, 916 F.3d 1149 (9th Cir. 2019). There, Arrey credibly testified that her former abuser had found her while she was hiding in a city that was a two-hour drive from where the abuser lived in Cameroon. *See id.* at 1154–55. Arrey didn't know whether her abuser was still pursuing her after she

19

came to the United States, however. *Id.* at 1155. Despite that uncertainty, the Ninth Circuit held that Arrey indisputably met her burden under the CAT to show that it was more likely than not that she'd be tortured if she returned to Cameroon (which is more than four times larger than Honduras in terms of land), and that substantial evidence didn't support the Board's conclusion that she could safely relocate. *Id.* at 1160–61.

*Arrey* is distinguishable in two important respects: Arrey's abuse was more recent (two years before her hearing) and she had a theory for why her abuser could track her down (his business connections), albeit one that the Board found implausible. *Id.* at 1153–56. But notwithstanding these differences, *Arrey* illustrates that "bare speculation" that an applicant can relocate to avoid a serial abuser isn't enough. *Id.* at 1161; *see also Tassi*, 660 F.3d at 719 (stating that IJs may not "rely on speculation, conjecture, or an otherwise unsupported personal opinion to discredit an applicant's testimony or her corroborating evidence" (quoting *Jian Tao Lin*, 611 F.3d at 237)). Further, like Arrey's abuser, Auceda once tracked Ortez-Cruz down after she'd moved away. And unlike Arrey, Ortez-Cruz has the benefit of the presumption. If Arrey proved indisputably that she can't reasonably be expected to safely relocate, then the government failed to prove that the reverse is true for Ortez-Cruz.

As with the changed circumstances condition, it will often be difficult for the government to prove that an applicant can safely and reasonably relocate to avoid a serial abuser. But there are ways to do it. The government can show that the applicant's home country has a good infrastructure for protecting or sheltering domestic-violence victims, or

20

provide statistical evidence (if it exists) as to the likelihood that a serial abuser would track down a former victim after years without contact. With regard to applicants from larger countries, it may sometimes be enough to show that the applicant is educated or has work experience, or that she had access to housing in different areas of the country, thus enabling her to relocate freely. *See Gonzalez-Medina v. Holder*, 641 F.3d 333, 338 (9th Cir. 2011) (upholding the Board's finding that an applicant could relocate within Mexico, in part because she had a large family that had experience finding shelter for domestic-violence victims).

The government did none of that here. Its only relevant evidence was about whether Auceda had tried to contact Ortez-Cruz in recent years. Such evidence, without more, doesn't prove that Ortez-Cruz can safely relocate. When comparing Ortez-Cruz and Owens's testimony against the government's lack of probative evidence, a reasonable adjudicator would be compelled to find that the government failed to meet its burden on the relocation issue.

* * *

Because the government failed to meet its burden as to either rebuttal condition, we vacate the agency's denial of Ortez-Cruz's withholding of removal claim and remand for the agency to grant her application.

B.

We turn now to Ortez-Cruz's claim for relief under the CAT. To establish eligibility for protection, an applicant must prove that it's "more likely than not" that, if she were

21

removed to Honduras, she would be tortured with the consent or acquiescence of a public

official. 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1). The CAT defines torture as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*Id.* § 1208.18(a)(1).

Crucially, past torture doesn't create a presumption of future torture under the CAT. *Suarez-Valenzuela v. Holder*, 714 F.3d 241, 245 (4th Cir. 2013). The burden of proof lies with Ortez-Cruz. *See* 8 C.F.R. § 1208.16(c)(2). To support her claim, Ortez-Cruz points to Auceda's past abuse and the Honduran government's alleged willful blindness to domestic violence.

After reviewing the evidence, we conclude that a reasonable adjudicator would not be compelled to find that Ortez-Cruz proved that there is more than a fifty-percent chance that Auceda would torture her and that Honduran law enforcement would turn a blind eye. In the CAT context, Auceda's past abuse doesn't require us to presume that he will harm Ortez-Cruz in the future. And a CAT claim requires the applicant to show that she will be *tortured*, not merely threatened (which is what a withholding claim requires).

This case is distinguishable from *Arrey* and other serial-abuser cases where CAT applicants have won relief because of the amount of time since Auceda's last contact with Ortez-Cruz and the fact that she didn't previously seek assistance from Honduran law

22

enforcement.  Accordingly, we affirm the agency's denial of Ortez-Cruz's application for relief under the CAT.

III.

For the reasons given, we grant Ortez-Cruz's petition for review with respect to her eligibility for withholding of removal and remand with instructions that the agency grant relief on that claim.  We deny her petition with respect to her claim under the CAT.

*PETITION FOR REVIEW GRANTED IN PART, DENIED IN PART, AND*
*REMANDED WITH INSTRUCTIONS*