**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1761**

MARTA LILIAN ALVARADO ALVARADO; A.P.R.A.,

Petitioners,

v.

WILLIAM P. BARR, Attorney General,

Respondent.

**No. 19-2258**

MARTA LILIAN ALVARADO ALVARADO; A.P.R.A.,

Petitioners,

v.

WILLIAM P. BARR, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: September 9, 2020                    Decided: November 1, 2020

Before MOTZ, AGEE, and KEENAN, Circuit Judges.

Petition for review granted and remanded for further proceedings by unpublished per curiam opinion. Judge Agee wrote an opinion concurring in the judgment.

---

ARGUED: Briana Dale Carlson, Benjamin J. Osorio, MURRAY OSORIO PLLC, Fairfax, Virginia, for Petitioners. Deitz Lefort, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, John S. Hogan, Assistant Director, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Marta Lilian Alvarado Alvarado, a citizen of El Salvador, and her minor child, A.P.R.A., appeal the decision of the Board of Immigration Appeals ("BIA") denying their application for asylum. Alvarado testified that she feared persecution upon return to El Salvador because a gang had threatened her and her family with death on several occasions. The Immigration Judge ("IJ") found Alvarado credible and concluded that she had suffered past persecution. This finding entitled Alvarado to a presumption that she had a well-founded fear of future persecution, a basis for asylum. But because Alvarado testified that she had no knowledge of additional threats to her family, the IJ denied asylum, finding that her circumstances had changed because the gang now posed no threat and the presumption had been rebutted. The BIA affirmed. Alvarado now petitions for review. For the reasons that follow, we grant the petition, vacate the BIA's denial of asylum and remand for further proceedings.

I.

On July 7, 2015, Alvarado and her daughter entered the United States without valid entry documents. The next day, the Department of Homeland Security served them with a Notice to Appear. The Department charged them as removable under the Immigration and Nationality Act ("INA") because they did not possess a "valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document." 8 U.S.C. § 1182(a)(7)(A)(i)(I).

3

On April 6, 2016, the IJ held a preliminary hearing. At the hearing, Alvarado conceded removability and submitted a Form I-589, in which she applied for asylum, withholding of removal, and protection under the Convention Against Torture.[1] On June 21, 2017, the IJ held a hearing on Alvarado's application. At the hearing, Alvarado testified that her mother received three extortion letters from the 18th Street Gang between January 2015 and March 2015 while Alvarado lived with her in El Salvador. Each letter demanded that her mother pay the gang several hundred dollars or it would harm Alvarado and her siblings. Alvarado's sister, her partner, and her father — all of whom reside in the United States — helped her mother pay the extortion money.

Alvarado testified that the gang targeted her mother because the gang knew her family in the United States could pay the extortion demands. She acknowledged several times that although she spoke with her mother every day or every other day, she did not know if threats to her family continued after she fled to the United States. When questioned as to why that was, Alvarado explained that she thought her family might not tell her of new threats because they did not want to worry her.

Roberto Lovato, knowledgeable on country conditions in El Salvador and South American gangs, also testified as an expert for Alvarado at the hearing. He explained that El Salvador suffered from a nationwide gang problem. When individuals do not comply with extortion threats, they are tortured or killed. According to Lovato, due to frequent cooperation between police and gangs, law enforcement in El Salvador likely would not

---

[1] On appeal, Alvarado challenges only the BIA's denial of her application for asylum, so we do not address her withholding of removal or CAT claims.

provide Alvarado with protection if she returned. Lovato explained that Alvarado's family members who remained in the country were likely to continue to be targeted by gangs. He further testified that even if gangs had not actively threatened Alvarado's family for two years, Alvarado remained at risk upon her return to El Salvador.

The IJ found Alvarado's testimony "direct, straight forward," "detailed," and "consistent with the information submitted in support of the applications for relief and the supporting materials." A.R. 94. He found both Alvarado and her expert credible. The IJ found that the extortion letters Alvarado's mother received from the 18th Street Gang in 2015 constituted past persecution. He also found that Alvarado established membership in a particular social group — the nuclear family of her mother — and that the persecution resulted from her membership in that group. But the IJ denied Alvarado's application for relief on the ground that the evidence did not establish that Alvarado would continue to face persecution upon return to El Salvador. The IJ reasoned that, although Alvarado spoke with her mother almost every day, she "testified that she was unaware of any threats having been made to any family member since she left" El Salvador or of any extortion payments made by her family after her departure. A.R. 95. For this reason, the IJ concluded that the presumption that she would suffer future persecution "has been rebutted."

Alvarado appealed to the BIA, which affirmed the IJ. It also based its decision on Alvarado's testimony that she talked with her mother nearly every day, but had "not heard of the family being subjected to any further threats." Alvarado then filed a petition for review in this court. When, as here, the BIA affirms the IJ with an opinion of its own, we review both decisions. *See Salgado-Sosa v. Sessions*, 882 F.3d 451, 456 (4th Cir. 2018).

5

We give BIA decisions regarding an order of removal "substantial" deference, *Essohou v. Gonzales*, 471 F.3d 518, 520 (4th Cir. 2006), and uphold the BIA decision unless it is "manifestly contrary to law," 8 U.S.C. § 1252(b)(4)(C).

## II.

The Immigration and Nationality Act permits the Attorney General to confer asylum on any refugee. 8 U.S.C. § 1158(b). As relevant here, the statute defines a refugee as a noncitizen who is unable to return to her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group." *Id.* § 1101(a)(42)(A). The applicant seeking refugee status bears the burden of showing a well-founded fear of persecution. *See Essohou*, 471 F.3d at 520. An applicant who demonstrates past persecution on the basis of a protected ground, such as membership in a protected social group, is presumed to have a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1). The Government can rebut this presumption only by proving, by a preponderance of evidence, either (1) a "fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution" or (2) that the applicant "could avoid future persecution by relocating to another part" of the country. *Id.* §§ 208.13(b)(1)(i)(A), (b)(1)(i)(B), (b)(1)(ii). The Government relied on the first ground here.

Alvarado initially argues that the IJ improperly shifted the burden to her to demonstrate she had *not* experienced a "change in circumstances" leaving her without a well-founded fear of persecution. *See id.* §§ 1208.13(b)(1)(i)(A), (ii). She points to the

6

IJ's statement in its ruling that "it appears to the Court that while the respondent did suffer past persecution in the form of death threats made against her, the respondent has failed to carry her burden in establishing that she will continue to face persecution if she returns to El Salvador." At two other points, however, the IJ recited the correct standard: that because Alvarado had established past persecution, the burden rested on the Government to overcome the presumption that Alvarado would continue to suffer persecution if she returned to El Salvador.

We need not resolve the question of whether the IJ applied the correct burden of proof, because even if the IJ did so, the Government has fallen short of meeting that burden. We review the BIA's factual finding that circumstances had changed such that Alvarado no longer feared persecution under the substantial evidence standard. *See, e.g.*, *Ortez-Cruz v. Barr*, 951 F.3d 190, 198 (4th Cir. 2020). Under the substantial evidence standard, a court affirms the factfinders' conclusions unless "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). While our review is deferential, we must still "ensure that unrebutted, legally significant evidence is not arbitrarily ignored by the factfinder." *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011) (internal quotation marks omitted). The agency may not "base a decision on only isolated snippets of the record while disregarding the rest." *Id.* (alterations adopted).

In meeting its burden, the Government declined to introduce any evidence, and instead relied solely on the testimony of Alvarado and her expert. We recently faced a similar situation in *Ortez-Cruz*. There, the IJ held that the Government overcame the presumption of future harm to the applicant — a victim of domestic violence — by relying

only on the applicant's testimony that the abuser had not contacted her in 16 years. *Ortez-Cruz*, 951 F.3d at 196. The IJ found that the applicant's evidence was "ambiguous" and "inconclusive" about whether the abuser still intended to harm the applicant. *Id.* We reversed, holding that the Government did not rebut the presumption of future harm given the "ambiguous" evidence. *Id.* at 198. We explained that although the Government may rely solely on an applicant's evidence when the record "would point unambiguously" to changed circumstances, if an applicant presents evidence rendering that conclusion "ambiguous" or "inconclusive," the Government "must prove that its view of the evidence . . . is the most convincing one." *Id.*

This case, too, presents an ambiguous record. Alvarado testified that she did not know of ongoing threats to her family in El Salvador, but nearly every time she did so, she qualified her statements by indicating that she was not *aware* of continued threats. *See, e.g.*, A.R. 151 (indicating she was not "aware of any threats that have been made to [her] family" since she arrived in the United States); A.R. 191 (when asked whether anyone in her family has received any additional threats since she arrived in the United States, she replied, "[n]ot that I know of"); A.R. 190 (confirming that "to the best of [her] knowledge," no further threats had been made on her family).

Moreover, Alvarado offered a plausible explanation for her lack of knowledge — that her mother may not have apprised her of ongoing threats so that she would not worry. Alvarado initially and repeatedly so testified. She testified that her mother did not mention any new threats since she left El Salvador so she "won't be worried." A.R. 151. When asked whether she was "positive" that her mother had not received any new threat letters,

8

Alvarado again acknowledged that her mother had not told her anything about new threats, but added, "maybe not to worry me." A.R. 192. The Government presented no evidence challenging this account and the IJ failed to acknowledge it. In an "ordinary case" in which the applicant holds the burden of proof, "we could not reverse the agency's determination unless the record compel[led] selection" of Alvarado's explanation for why her family may have continued to receive threats, despite her lack of knowledge. *See Sheng Da Dong v. Sessions*, 743 F. App'x 513, 521 (4th Cir. 2018). But here, "it is up to the Government to prove that its inference is the more likely one," *id.*, and it has not done so.

At oral argument, the Government insisted that Alvarado gave "unambiguous" testimony that the threats had stopped. It relied primarily on Alvarado's acknowledgement, near the end of her testimony in response to questioning by the IJ, that her mother "hasn't received any more letters asking her for money." A.R. 191. But the Government ignores Alvarado's repeated initial and subsequent explanation that her family may not have told her about new threats so as "not to worry" her. A.R. 192. The agency cannot "disregard[] important aspects of" the record. *See Jian Tao Lin v. Holder*, 611 F.3d 228, 235 (4th Cir. 2010). And while the Government may face difficulty in proving that individuals "in another country no longer" pose a threat, "that is consistent with the presumption." *Ortez-Cruz*, 951 F.3d at 200.

And, as in *Ortez-Cruz*, the IJ also ignored relevant parts of the expert's testimony that undermined the Government's theory. Lovato testified that gangs would likely continue to target and potentially harm Alvarado's family members who remained in El Salvador. The IJ failed to acknowledge this part of Lovato's testimony. Lovato also

9

testified that, even if the threats stopped while Alvarado remained in the United States, he believed the threats would resume if she returned. The Government neglected to address this testimony at all, and the IJ did not consider it in his decision. As in *Ortez-Cruz*, the IJ "should have given it weight in assessing whether" Alvarado would face a threat upon her return. *See id*. at 199.

The Government may of course rely solely on an applicant's testimony when that testimony unambiguously indicates changed circumstances have occurred. We explained in *Ortez-Cruz* that if an applicant testifies that her abuser had died, a "change of circumstances" finding "obviously would be proper — even without evidence or argument from the Government — because the record would point unambiguously in that direction." *Id*. at 198. But here, Alvarado's testimony, like that of the applicant in *Ortez-Cruz*, did not conclusively establish a change in circumstances. Accordingly, the Government bore the burden to demonstrate that that it was *more* probable that Alvarado's lack of knowledge of continued threats against her family resulted from an actual end to the threats than from her family's desire to prevent her from worrying. The Government, however, presented no evidence addressing this ambiguity. And *Ortez-Cruz* instructs that the Government cannot overcome the presumption of future persecution by relying *solely* on ambiguous evidence introduced by the applicant. *Id*. at 198. For these reasons, we can only conclude that no reasonable adjudicator could find that the Government proved a change in

10

circumstances such that Alvarado no longer had a well-founded fear of future persecution. We thus vacate the BIA's decision affirming the denial of Alvarado's asylum application.[2]

III.

For the foregoing reasons, we grant the petition for review and remand for further proceedings consistent with this opinion.

*PETITION FOR REVIEW GRANTED AND*
*REMANDED FOR FURTHER PROCEEDINGS*

---

[2] Alvarado also filed a motion to reopen with the BIA on September 4, 2018. The BIA denied this motion on October 28, 2019. She filed a second petition for review appealing that BIA order, and her petitions for review were combined on November 8, 2019. Because we vacate the BIA's decision denying Alvarado's application for relief, her petition for review on the order denying the motion to reopen — as well as her other claims — are moot.

AGEE, Circuit Judge, concurring in the judgment:

In light of our recent holding in *Ortez-Cruz v. Barr*, 951 F.3d 190 (4th Cir. 2020), I agree that we are required to remand this case for further proceedings. Were it not for that decision, I would deny the petition for review. *See United States v. Cobb*, 970 F.3d 319, 332 (4th Cir. 2020) (explaining the basic principle that one panel is "powerless to overrule the decision of a prior panel of this court").

I.

The Per Curiam Opinion sets out much of the pertinent background, which I won't repeat or expand upon except to note the following. Because the Immigration Judge ("IJ") denied Alvarado's asylum application based solely on her testimony, we must consider the actual substance of what she said and the context in which she said it. Only then will we be able to determine whether her testimony fails to "unambiguously indicate[] changed circumstances have occurred." Per Curiam Op. 10. As discussed further below, apart from Alvarado's unfounded suppositions, I believe that testimony does show changed circumstances.

Alvarado testified on direct examination:

Q:	Since you arrived in the United States are you aware of any threats that have been made to your family?
A:	No
Q:	Have you had any communication with your family?
A:	Yes

Q:	And have they said anything to you about any threats towards your family since you left?
A:	No

12

Q:     *Why do you think that is?*
A:     *I'm not [sic], so that we won't be worried.*

A.R. 151 (emphases added).

On cross-examination, Alvarado testified that she spoke to her mother "[e]very day or every other day," A.R. 180, before answering the following questions:

Q:     Has anyone in your family received any more threats, any additional threats than what you've told us about already today?
A:     My siblings, or brothers and sisters?
Q:     Yes, has anyone received threats since, since you've come to the United States?
A:     Not that I know of.
Q:     *Do you ask?*
A:     *I ask my mother but she says no.*

A.R. 180–81 (emphases added).

In response, the IJ observed that

[i]t would be important to the respondent's case, I think, to be able to say, definitively, whether or not there is still continued payment of the threats or in the absence of paying any threats, whether the family has been harmed, because if the family continues to live in that environment and they have not been harmed, even though they had not paid any threats, then it would appear to undermine the respondent's claim that she too would be harmed if she were back in El Salvador.

A.R. 189. The IJ then engaged in the following back-and-forth with Alvarado:

Q:     Ms. Alvarado, you testified earlier today that to the best of your knowledge, after you left El Salvador and came to the United States, no further threats had been made against your family. Is that your testimony?
A:     Yes.
Q:     Now, if you know, since you left El Salvador, has your mother or other family [member] paid any extortion demands made by gangs?
A:     Not that I know of.
. . . .
Q:     Does your mother continue to pay extortion demands?

13

A: *No, it was only those times that we got those letters, that I know of, they haven't received any more letters.*

Q: So, is it correct to say that to the best of your knowledge, your mother has not received any extortion demands since sometime in July 2015, when you came to the United States?

A: Not any more [sic].

Q: When you say not anymore, you mean that she does not pay any extortion money now, not anymore? Is that what you mean?

A: *Yes, she hasn't received any more letters asking her for money.*

A.R. 190–91 (emphases added).

Alvarado's attorney then asked her the following question on re-direct:

Q: Are you 100 percent positive that she's not received any letters, or are you just testifying to your knowledge?

A: *She hasn't told me anything, maybe not to worry me, but she hasn't told me.*

A.R. 192 (emphasis added). After a brief recess, Alvarado's attorney recalled her to the

stand to question her again on the issue:

Q: Why do you think [you would be extorted when you went back to El Salvador] when nobody in your family has been threatened for the last, that you know of, has been threatened for the last two years?

A: We paid the money that they asked for.

Q: What do you mean by that?

A: When they asked us for the money, we paid it, that's why they didn't harm anybody in the family.

Q: But, to the best of your knowledge, that all happened two years ago, why would it start back up if you went back?

A: *I don't know.*

A.R. 195–96 (emphasis added).

The IJ later determined that the extortion letters and death threats "indicate[d] that

[Alvarado] suffered past persecution, she and the family members, on a number of

occasions." A.R. 94. Recognizing that this finding meant that Alvarado "benefit[ed] from

a presumption that she will continue to suffer persecution should she be returned to El

Salvador," the IJ observed that the "presumption [could] be rebutted by the Government

14

by a showing of either (1) changed country conditions such that the respondent need no longer fear prosecution, or (2) there is an internal relocation alternative available to the respondent which is viable." A.R. 96. After determining the second option was unavailable, the IJ concluded:

> Based upon the evidence of record, it appears . . . that while [Alvarado] did suffer past persecution in the form of death threats made against her, the respondent has failed to carry her burden in establishing that she will continue to face persecution if she returns to El Salvador. She has failed to carry that burden principally because the group to which she belongs, the particular social group, family members of [her mother], have continued to live in El Salvador for the past two years, have not been threatened, have not paid extortion, at least so far as the evidence of this case has indicated. Therefore, . . . the presumption that [Alvarado] would continue to suffer persecution has been rebutted by the respondent's own testimony and corroborated to some degree by the testimony of the respondent's expert, Roberto [Lovato].

A.R. 99.

## II.

If Alvarado's petition were before us on a clean slate as a matter of first impression, I would have little trouble denying it. Her testimony makes clear that not only was she "not *aware* of continued threats," Per Curiam Op. 8, she was affirmatively told there were none. Alvarado *specifically asked* her mother—with whom she spoke "[e]very day or every other day," A.R. 180—whether the threats were ongoing after she left for the United States. And Alvarado testified that her mother unequivocally said they were not. *See* A.R. 181. Considering the record as a whole, this acknowledgement—in conjunction with the IJ's finding that Alvarado's expert witness "could not, as far as I can determine, account for why there would be a hiatus, why there would be a stop in the persecution or extortion by

15

the gangs," A.R. 230—should be enough to prevent "any reasonable adjudicator" from being "*compelled* to conclude to the contrary." 8 U.S.C.§ 1252(b)(4)(B) (emphasis added); *see also Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011) (stating that "we must treat [the agency's] findings of fact as conclusive unless the evidence was such that any reasonable adjudicator would have been compelled to a contrary view").

As recognized in the Per Curiam Opinion, however, our recent decision in *Ortez-Cruz* requires us to hold otherwise. There, the IJ found the Government had carried its burden in rebutting the presumption of future harm because the applicant—who had suffered years of horrific violence at the hands of her former partner—had not been contacted or harmed by her abuser in 16 years. 951 F.3d at 195–96. The IJ determined this substantial lapse in time, along with "[its] view [that] much of [the applicant's] testimony regarding her fear of future persecution was too speculative to be given much weight," was sufficient to show that "circumstances had fundamentally changed since" the applicant was last harmed. *Id.* at 196. The Board of Immigration Appeals ("BIA") affirmed. *Id.* at 197.

The Court granted the applicant's petition for review, concluding that even though "[t]here may be cases where the [BIA] can rely solely on the applicant's own evidence (or her testimony on cross-examination) in finding one of the two conditions that rebut the presumption," the bar to do so is exceedingly high. *Id.* at 198. For example, the Court hypothesized that if the applicant "had testified that [her abuser] was dead, a 'fundamental change of circumstances' finding obviously would be proper—even without evidence or argument from the government—because the record would point unambiguously in that direction." *Id.* Absent such irrefutable testimony, however, the Court held that the

16

Government is required to adduce its own evidence to prove the negative—i.e., the applicant's speculation that her abuser still posed an active threat was not viable. *Id.*

That said, the Court recognized that "[i]t will sometimes be difficult for the government to prove that an individual in another country no longer poses a threat." *Id.* at 200. "But that [burden] is consistent with the presumption. It puts a thumb on the scale for applicants who show past harm. A lack of proof as to whether [the abuser] retains interest in [the applicant] can't be held against her." *Id.* In my view, the Court's standard outlined in *Ortez-Cruz* has transformed that "thumb on the scale," *id.*, into a Sisyphean boulder the Government will rarely, if ever, be able to dislodge. In effect, *Ortez-Cruz* converts the regulation's rebuttable presumption into a de facto irrebuttable presumption. In my view, that dramatic expansion is error.*

And its impact can be clearly felt here. Alvarado's own testimony should be enough for the Government to prove a change in circumstances had occurred—she knew of past

---

* That the presumption at issue was not intended to be conclusive—i.e., irrebuttable—is further indicated by the language the Department of Justice has used in other regulations. *See, e.g.*, 28 C.F.R. § 74.4(b) (creating "irrebuttable presumptions" regarding eligibility under Civil Liberties Act). Other Government Agencies have also proved capable of making a presumption irrebuttable if they so desire. *See, e.g.*, 20 C.F.R. § 718.304 (Department of Labor creating various "irrebuttable presumptions" for miners diagnosed with pneumoconiosis); 26 C.F.R. § 1.166-2(d)(3)(ii) (Department of the Treasury authorizing use of a method of accounting that establishes a "conclusive presumption" of worthlessness for debts). As has Congress. *See, e.g.*, 30 U.S.C. § 921(c)(3) (creating various "irrebuttable presumptions" related to miners). That said, conclusive presumptions are exceedingly rare. Therefore, given the fact that Agencies and Congress alike know how to make presumptions irrebuttable, their choice to do the opposite here should be controlling. *See Discover Bank v. Vaden*, 396 F.3d 366, 370 (4th Cir. 2005) ("[W]here Congress knows how to say something but chooses not to, its silence is controlling."). And it is not the Judiciary's place to override that decision.

17

threats, but had been expressly told there were no current ones. But because, after counsel's prodding, she injected ambiguity into her testimony—specifically, that she could not be 100% sure the threats had actually stopped because of the speculative possibility that her mother might not be truthfully responding to her questions in an effort not to worry her— *Ortez-Cruz* requires the Government to put on its own evidence to rebut the presumption. This appears to diverge from the practice of at least some of our sister Courts of Appeals. *See, e.g.*, *Ming Li Hui v. Holder*, 769 F.3d 984, 986–87 (8th Cir. 2014) (holding that the applicant had established past persecution when her mother abused her as a child and that the Government rebutted the presumption in part because a significant amount of time had passed and the applicant was now an adult); *Yong An Zheng v. Holder*, 493 F. App'x 202, 203–04 (2d Cir. 2012) (summary order) (relying on the applicant's own testimony about his subjective fear of returning to China in finding that the Government had rebutted his presumption of a well-founded fear of future persecution). Nonetheless, the *Ortez-Cruz* requirement remains binding in this Court until altered by the Court sitting en banc or by the Supreme Court. *See Cobb*, 970 F.3d at 332.

III.

The IJ should be able to rely on an applicant's own testimony demonstrating a fundamental change in circumstances as sufficient to carry the Government's burden to rebut the presumption of future persecution. And an applicant's unfounded and unsupported conjecture should not compel the IJ to act otherwise. At a minimum, we should reconsider the broad implications of our decision in *Ortez-Cruz* as soon as an

appropriate case comes before us.  Until then, however, I am compelled by *stare decisis* to concur in the Per Curiam Opinion.